**Nelson Bunker HUNT, et al.**

v.

**UNITED STATES SECURITIES & EXCHANGE COMMISSION.**

No. CA3–81–0316–F.

United States District Court, N. D. Texas, Dallas Division.

July 13, 1981.

---

Ivan Irwin, Jr., Roger Golburg, Brett Ringle, Roderic Steakley, Shank, Irwin, Conant, Williamson & Grevelle, Dallas, Tex., for William Herbert Hunt and Lamar Hunt.

E. Barrett Prettyman, Jr., Philip C. Larson, Washington, D. C., for Nelson Bunker Hunt.

Paul L. Perito, John P. Wintrol, Hogan & Hartson, Washington, D. C., for Houston B. Hunt, Albert Huddleston, and Douglas H. Hunt.

Michael K. Wolensky, Associate Gen. Counsel, John P. Sweeney, Asst. Gen. Counsel, Richard M. Humes, Sp. Trial Counsel, and Shelley K. Parker, Washington, D. C., for defendant.

## MEMORANDUM OPINION AND ORDER

ROBERT W. PORTER, District Judge.

This action is currently before the Court on Plaintiff's motion for a preliminary injunction. Jurisdiction is predicated upon 12 U.S.C. § 3416,[1] and 28 U.S.C. § 1331.[2] Plaintiffs seek injunctive relief against the Defendant Securities & Exchange Commission ("SEC") to enjoin the agency from violating Plaintiffs' rights under the Right to Financial Privacy Act, 12 U.S.C. §§ 3401, et seq. Plaintiffs instituted this action originally with the filing of a motion to quash an SEC subpoena pursuant to 12 U.S.C. § 3410. Prior to a disposition of that controversy, however, the SEC withdrew the subpoena in question. Subsequently, Plaintiffs filed the complaint for injunctive relief which is currently in issue. As stated above, Plaintiffs predicate their claims upon the Right to Financial Privacy Act ("RFPA"), a statute enacted by Congress in 1978, and made applicable to the SEC as of November 10, 1980.[3] As a consequence of the relative youth of the statute, this action presents the Court with novel issues of law concerning the appropriate construction of the Act. The facts of the case, as I have found them, are recounted below in extensive preliminary findings of fact. Prior to any discussion of the factual scenario in which this action arises, however, a review of the history of this litigation is appropriate.

In January and February of 1981 the SEC issued certain requests for financial information to financial institutions to which the Plaintiffs in this action are "customers" as that term is defined by the RFPA. One such request was a subpoena duces tecum issued to First National Bancshares dated February 19, 1981. On March 2, 1981, after consultation with the SEC the Plaintiffs filed a motion to quash the subpoena with this Court alleging various deficiencies with respect to that subpoena. The SEC subsequently withdrew the subpoena. Thereafter, Plaintiffs withdrew their motion to quash, and on March 24th, 1981 filed their first original complaint for injunctive relief. In that complaint, Plaintiffs asserted three grounds for relief. First, they claimed that the SEC, in the course of its investigation, was exceeding the scope and purpose of the investigatory order issued by the Commission. Second, Plaintiffs asserted that the SEC, pursuant to its investigation, was intruding upon the exclusive jurisdiction of the Commodities Futures Trading Commission ("CFTC"). Finally, Plaintiffs alleged violations of the RFPA with respect to the SEC's requests for financial information directed at banking institutions. Simultaneous with the filing of the original complaint, Plaintiffs moved for a temporary restraining order, and for a hearing on their application for a preliminary injunction.

On March 31st, after reviewing the SEC's response to Plaintiffs' application for a temporary restraining order, the Court entered an order enjoining the SEC from taking any further testimony from William Herbert Hunt, Nelson Bunker Hunt, and James L. Parker in connection with its investigation. In addition, the Court directed the

1. "An action to enforce any provision of this chapter may be brought in any appropriate United States district court without regard to the amount in controversy within three years from the date on which the violation occurs or the date of discovery of such violation, whichever is later."

2. "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

3. 12 U.S.C. § 3422: "The Securities and Exchange Commission shall not be subject to the provisions of this chapter for a period of two years from November 10, 1978."

SEC to expedite the filing of its 12(b) motion to dismiss the action. On April 6th, 1981 the SEC filed its motion to dismiss all three grounds for relief asserted by Plaintiffs. The Commission made its motion pursuant to Rule 12(b)(1) and (6) asserting that, since the agency's requests for testimony and documents are not self-executing, and since the SEC had not moved to enforce any of its subpoenas or requests for testimony in federal court, the action was not ripe for judicial review and Plaintiffs had an adequate remedy at law. Concurrent with the filing of the SEC's motion to dismiss, Plaintiffs filed a motion to extend the temporary restraining order then in effect. On April 9th, 1981, the Court issued an oral ruling from the bench granting the SEC's motion to dismiss with respect to Plaintiffs' claims that the SEC was exceeding the scope of its investigatory order and intruding upon the exclusive jurisdiction of the CFTC. The basis for the ruling was that these claims were not ripe for judicial review, being as they were preenforcement claims brought during a pending agency investigation.[4] The Court, however, retained jurisdiction over Plaintiffs' claims under the RFPA. Accordingly, the Court dissolved the temporary restraining order then in effect and entered another Order restraining the SEC from violating Plaintiffs' rights under the RFPA, and in particular, issuing "update letters" to financial institutions requesting further production of financial information without notices to Plaintiffs. A hearing on Plaintiffs' application for a preliminary injunction was scheduled for April 20th, 1981, with expedited discovery during the interim.

Subsequent to the April 9th, 1981 Order the SEC moved for a protective order staying discovery in this action. The Commission represented to the Court that it would consent to an extension of the April 9th, 1981 temporary restraining order (enjoining the SEC from violating Plaintiffs' rights under the RFPA), and sought certification for an interlocutory appeal of the Court's Order denying the SEC's motion to dismiss with respect to Plaintiffs' claims under the RFPA. In response to the SEC's motion, Plaintiffs applied for a protective order preventing the SEC from taking further testimony from Plaintiffs in connection with the SEC investigation. Plaintiffs noted that the Court had ordered expedited discovery with respect to this action, and that conflicting demands from the agency with respect to discovery in furtherance of the investigation would place a hardship on Plaintiffs, as well as the orderly disposition of this action. The Court heard the parties on the matter on April 14th, 1981, and the following day entered an order denying the SEC's requests for a stay of discovery and certification for an interlocutory appeal. The Court stayed further discovery of Plaintiffs by the SEC pursuant to its investigation until the preliminary injunction hearing had been concluded.

Expedited discovery proceeded as ordered but on or about April 17th, 1981, the SEC requested that the Court reschedule the preliminary injunction, consenting to an extension of the temporary restraining order then in effect as well as the temporary stay of discovery in force with respect to the SEC's investigation. By written order of April 17th, 1981, the Court granted the SEC's request. Beginning on April 22nd, 1981, the Court heard four days of testimony in connection with Plaintiffs' claims under the RFPA. In addition, the parties have filed numerous depositions and attendant designations with the Court. Finally, on May 11th, 1981, the Court heard final arguments in the case and by May 21st, 1981, the parties had filed proposed findings of fact and conclusions of law. In the interim, however, and prior to final arguments, Plaintiffs moved to amend their

---

4. *See, e. g. Abbott Laboratories v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); *Toilet Goods Assoc. v. Gardner*, 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967); *Gardner v. Toilet Goods Assoc.*, 387 U.S. 167, 87 S.Ct. 1526, 18 L.Ed.2d 704 (1967); *Dresser Indus-tries, Inc. v. United States*, 596 F.2d 1231 (5th Cir. 1979), *cert. denied*, 444 U.S. 1044, 100 S.Ct. 731, 62 L.Ed.2d 730 (1980); *Atlantic Richfield v. Federal Trade Commission*, 546 F.2d 646 (5th Cir. 1977).

complaint. The SEC vigorously opposed the amendment, primarily on grounds that it was filed at the "eleventh hour" approximately a week after the evidence had been concluded and shortly before final argument. The Court concluded that the amendment should be granted for purposes of an eventual trial on the merits, but not in connection with Plaintiffs' application for a preliminary injunction.

■■ As stated above, this action is before the Court on Plaintiffs' application for a preliminary injunction. A preliminary injunction is an extraordinary remedy committed to the discretionary power of the district court. *Compact Van Equipment Co. v. Leggett & Platt, Inc.,* 566 F.2d 952, 954 (5th Cir. 1978). This discretion must be exercised in light of four prerequisites for the issuance of such extraordinary relief:

1. a substantial likelihood that the movant will ultimately prevail on the merits;

2. a showing that the movant will suffer irreparable injury unless the injunction issues;

3. proof that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and

4. a showing that the injunction, if granted, would not be adverse to the public interest.

*See Foley v. Alabama State Bar,* 648 F.2d 355, 358 (5th Cir. 1981); *Compact Van, supra* at 954; *Canal Authority v. Callaway,* 489 F.2d 567, 572–73 (5th Cir. 1974). The primary justification for the entry of a preliminary injunction is to preserve the trial court's ability to render a meaningful decision on the merits. *Canal Authority, supra,* at 573. Further, the movant must clearly carry the burden of persuasion with respect to all of the prerequisites noted above. *Id.*

In this action, the factor which is mainly in issue is the second one noted above—whether Plaintiffs have made a sufficient showing of irreparable injury which will occur in the absence of the entry of a preliminary injunction.

## I. PRELIMINARY FINDINGS OF FACT

### A. COMMENCEMENT OF THE INVESTIGATION

As a result of the so-called "silver crisis" in the commodities futures market in 1979 and early 1980, the activities of Plaintiffs Nelson Bunker Hunt ("N. B. Hunt"), William Herbert Hunt ("W. H. Hunt") and others involved in those markets became the subject of extensive investigation by several congressional committees and federal agencies, including the SEC and the Commodities Futures Trading Commission ("CFTC"). The SEC embarked upon a formal non-public investigation ("the SEC investigation") pursuant to a March 27, 1980 Order Directing Private Investigation and Designating Officers to Take Testimony styled *In the Matter of Bache Group, Inc., Nelson Bunker Hunt, William Herbert Hunt,* HO–1233. The March 27 Order designates certain officers of the SEC who are empowered to conduct the investigation, and directs those officers to investigate possible violations of sections 10(b) and 15(c) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b), *o* (c) and the rules promulgated thereunder. Specifically, the March 27 Order alleges as follows:

1. Bache Group, Inc. ("Bache Group") is a Delaware corporation whose common stock is registered with the SEC pursuant to § 12(b) of the Exchange Act;

2. Bache, Halsey, Stuart, Shields, Inc. ("Bache"), a wholly owned subsidiary of Bache Group, is a broker-dealer registered with the SEC pursuant to § 15(b) of the Exchange Act;

3. N. B. Hunt and W. H. Hunt are shareholders of Bache Group;

4. In connection with transactions in the securities of Bache Group and other issuers, certain persons may have violated § 10(b) of the Exchange Act by virtue of certain statements, omissions or acts with respect to the financial position of Bache, and transactions between shareholders of Bache Group and/or Bache; and

5. Bache may have engaged in transactions in securities or may have induced or attempted to induce purchases and sales

of securities at a time when it was not in compliance with the SEC's net capital rules.

Subsequently, on April 4, 1980, the SEC issued an Amended and Substituted Order broadening the scope of the investigation. In addition to the allegations set forth in the May 27 order, the Amended Order alleges as follows:

1. W. B. Hunt and W. H. Hunt, directly and indirectly beneficially owned over five percent of the outstanding common stock of Bache Group;

2. N. B. Hunt, W. H. Hunt and/or other members of their family had not filed a statement with the SEC pursuant to § 13(d)(1) of the Exchange Act and rules promulgated thereunder concerning their direct or indirect acquisition of beneficial ownership of more than five percent of the outstanding shares of common stock of Bache Group;

3. N. B. Hunt, W. H. Hunt, and other members of their family, as well as Hunt Mineral International, Ltd. ("HMIL"), and other corporations and entities directly and indirectly controlled by or associated with them, engaged in numerous transactions in securities, silver bullion, futures contracts for silver and other commodities which have resulted in, or may result in

 a. Bache and other broker-dealers being placed in a materially adverse financial condition, which may impact upon its customers, shareholders, investors, and others;

 b. actionable fraud pursuant to § 10(b) of the Exchange Act upon broker-dealers and corporations which file reports with the SEC concerning

 (1) the financial condition of Bache, other broker-dealers and corporations;

 (2) the ability of Bache, other broker-dealers and other corporations and entities to meet their financial and regulatory obligations;

 (3) the nature and extent of direct and indirect financial relationships of the Hunts, their family, and other corporations and entities associated with them with Bache and other broker-dealers and corporations; and

 (4) the ability and intent of the Hunts, their family, and corporations and entities controlled by or associated with them to meet present and future margin calls and other financial obligations to broker-dealers and corporations; and

4. Periodic and other reports filed with the SEC by Bache Group, broker-dealers, and corporations may not have fully and accurately reflected the nature and extent of the transactions and relationships of Bache Group, Bache, and others with the Hunts, their family, HMIL and other corporations and entities controlled by or associated with them.

The Amended Order cited possible violations of §§ 10(b), 13(a), 13(d) and 15(c) of the Exchange Act, as well as the rules promulgated thereunder, and designated certain named officers of the SEC to conduct the investigation. Finally, the Amended Order stated that the purpose of the investigation was to determine if the acts alleged had occurred or would occur, whether new rules or regulations should be promulgated, and to secure information for the basis of recommending new legislation. Since April 4, 1980 to the present, the Amended Order has remained in effect without substantive amendment although it has been supplemented on several occasions by orders designating additional individuals as officers of the SEC investigation.

In addition to the SEC investigation, Congress and other public agencies responsible for overseeing the various sectors of the financial community involved in the "silver crisis" have conducted inquiries into the circumstances surrounding the events out of which the SEC inquiry arose. The Subcommittee on Commerce, Consumer, and Monetary Affairs of the United States House of Representatives Committee on Government Operations, chaired by Benjamin F. Rosenthal, issued an extensive report of its hearings on the "silver crisis" ("Rosenthal Report") in the spring of 1980. Similarly, the CFTC is conducting an inves-

tigation into the Hunts' silver trading activities to determine if there have been violations of the Federal Commodities laws.

### B. STAFFING THE INVESTIGATION

The SEC investigation is being conducted by a group of SEC employees known within the SEC as the "Bache Team". Theodore A. Levine, Associate Director in the Division of Enforcement, was given-over all responsibility for the SEC's Bache investigation. Levine reported directly to Stanley Sporkin, then Director of the Division of Enforcement. As part of his responsibilities, Levine supervises the activities of 40 to 50 employees of the Division of Enforcement, including investigations, litigation and various regulatory matters which arise in connection with the SEC's activities. In addition, Levine is also involved in the general administration of the Division of Enforcement. Other staff members assigned to the "Bache Team" were selected from various branches in the Division of Enforcement. This is not a usual practice: ordinarily matters are staffed according to the branch structure of the Division of Enforcement. Kenneth G. Lay, a Branch Chief in the Division of Enforcement, was assigned to the investigation in April, 1980. Lay assumed day-to-day supervisory responsibility for the investigation although Levine, as Associate Director, had overall responsibility for the investigation. Lay reported directly to Levine. Lay has never been appointed as an Assistant Director of the Division of Enforcement and has never been instructed, either orally or in writing, to act as Assistant Director. His application for the position of Assistant Director was denied in 1980 based in part on his lack of sufficient supervisory experience.

On or about January 27, 1981, Gail Vance, a staff attorney within the Division of Enforcement, joined the Bache Team. Lay asked her to handle those matters pertaining to the investigation which concerned public financial institutions. She reported to Lay in this regard. The Supplemental Order designating Vance as an additional officer authorized to conduct the investigation is defective in that it refers to a March 28, 1980 Order of the SEC authorizing the investigation. The Order and Amended Order authorizing the investigation are dated March 27, 1980 and April 4, 1980 respectively. In addition to the original Supplemental Order designating Vance as an officer of the SEC for purposes of HO–1233, the official SEC files also contained a similar order dated February 27, 1981, likewise designating Vance as an officer in the investigation. During the week of March 16, 1981, however, Lay removed this order from the file and destroyed it. At this time Lay believed that the issue of Vance's authorization to participate in the investigation pursuant to § 21(b) of the Exchange Act was "dead" because he believed the Plaintiffs' original Motion to Quash, dated March 2, 1981 had been withdrawn.

### C. THE PLAINTIFFS

Each of the named Plaintiffs in this action are individuals utilizing the services of financial institutions which have been the subject of SEC requests for information. In addition, there are two partnerships involving fewer than five individuals in which some of the Plaintiffs are partners, and which maintain accounts with financial institutions which have been the subject of SEC requests for information. Hunt International Petroleum Company of Canada ("HIPCO") is a partnership in which Plaintiffs W. H. Hunt, N. B. Hunt and Lamar Hunt are the only partners. HIPCO is a "customer" as that term is defined in the RFPA, of the Royal Bank of Canada ("Royal Bank"). Hunt-Stephens is a partnership in which Plaintiff W. H. Hunt and another individual, Paul Stephens, are the only partners. Hunt-Stephens is a "customer" as that term is defined in the RFPA, of Republic National Bank of Dallas ("Republic"). The individual Plaintiffs are "customers" as that term is defined in the RFPA, of the following financial institutions:

1. W. H. Hunt-First National Bank in Dallas, ("First in Dallas"); First National Bank of Chicago, ("First of Chicago"); Republic; Citibank N.A. ("Citibank"); as a partner in Hunt-

Stephens, Republic; and as a partner in HIPCO, Royal Bank;

2. Lamar Hunt—First in Dallas; Republic; First of Chicago; and as a partner in HIPCO, Royal Bank;

3. N. B. Hunt—First in Dallas, Republic, First of Chicago; City Bank; and as a partner in HIPCO, Royal Bank;

4. Douglas H. Hunt—First in Dallas;

5. Houston B. Hunt—First in Dallas;

6. Albert D. Huddleston—First in Dallas.

## D. EARLY DEVELOPMENTS

At the outset of the investigation, the SEC sought production of documents and records concerning the financing of the silver transactions discussed above and the financial condition of the entities providing the financing. The SEC also sought (1) to identify major participants in the financing, including the Hunts, registered broker-dealers, banks, corporations and securities and commodities exchanges, and (2) to elicit documentary and testimonial evidence establishing the magnitude of the financial exposure of broker-dealers and publicly held reporting companies as a result of the Hunts' trading activities.

The SEC served subpoenas duces tecum on the Hunts on April 18, 1980, calling for production of documents relating to their transactions and accounts with Bache and other registered broker-dealers which related to silver collateralized borrowing. After requesting and receiving from the Commission several extensions of time, the Hunts began to produce materials on or about May 14, 1980. The materials related to, among other things, the Hunts' commodity trading accounts with broker-dealers registered with the SEC as well as similar accounts with futures commission merchants registered with the CFTC. The Hunts produced materials relating to loans from both publicly held and privately held banks, and to transactions between the Hunts and public and private corporations.

The SEC's investigation of the Hunts' acquisition of more than 5% of Bache Group stock, and their failure to comply with Section 13(d) of the Securities Exchange Act in connection with those transactions, was one of the areas pursued independently of the rest of the investigation. Pursuant to subpoenas, the SEC took the investigative testimony of N. B. Hunt, W. H. Hunt and Charles Mercer, assistant treasurer of Hunt Energy Corp., for approximately one-half day each on July 29, August 22 and July 28, 1980, respectively. This testimony, on dates agreed to by the Hunts and their counsel, was held with the express understanding that the testimony was to cover only the Section 13(d) aspect of the investigation. The limited testimony by W. H. Hunt and N. B. Hunt has been the only testimony of Hunt family members taken in the investigation. The SEC and counsel for the Hunts expressly agreed that testimony on the other issues of the case—particularly those relating to the financing of their silver trading—would go forward at a mutually acceptable later date.

In late December 1980, the SEC made efforts to voluntarily obtain information from the Hunts concerning overall financial exposure of broker-dealers and lending institutions as a result of loans to the Hunts and entities they control. On December 30, 1980, Lay sent a letter to Roger Goldburg, one of the attorneys for the Hunts, requesting information concerning the nature and amount of loans available and outstanding to the Hunts. In a letter dated January 12, 1981, Goldburg advised Lay that the information requested by Lay in his December 30, 1980, letter would not be provided by the Hunts, suggesting that much of the information could be compiled from documents already produced by the Hunts and from information provided by other individuals and entities.

When Vance was assigned to the investigation, she was given responsibility by Lay to gather the facts that related specifically to the exposure of the banking institutions. Among other things, the SEC's investigation was examining possible failures by certain public corporations, including bank holding companies, to report the risks posed

by loans used to purchase or pay for obligations incurred in connection with the Hunts' silver transactions.

On January 28, 1981, Lay, Vance, Anthony Djinis and Judith Perlman, staff attorneys in the Commission's Division of Enforcement assigned to the Bache Team, met with certain of the Plaintiffs' attorneys, including Goldburg and Roderic Steakley, an associate of Goldburg's law firm, at the headquarters office of the SEC. The meeting was held at the request of the Hunts' counsel to discuss the SEC investigation generally and the scope of the matters to be covered in the testimony of N. B. Hunt and W. H. Hunt, which the SEC was seeking to complete. At the January 28, 1981 meeting, the Commission's staff delineated the kind of information the SEC sought, and explained in detail the relationship of that information to both the SEC's inquiry as set out in the formal order and the SEC's jurisdiction generally.

On February 17, 1981, Djinis, Lay and Levine met with Ivan Irwin, one of Plaintiffs' attorneys, at the headquarters office of the SEC. Levine explained once again that a principal focus of the investigation was the extent to which the Hunts' activities had adversely affected the financial condition of broker-dealers and public companies. Levine assured the Hunts' counsel that the SEC's primary object was not to reconstruct the Hunts' balance sheet, but to determine the extent of the Hunts' silver-related liabilities, whether they were able to meet their obligations to registered broker-dealers and to publicly held companies, whether any material financial risk to those institutions had been fully disclosed and to gather information respecting possible securities violations.

### E. THE HEART OF THE MATTER

#### 1. The "Abboud Consents".

In April of 1980 the SEC issued a subpoena duces tecum to the First Chicago Corporation calling for the production of all documents and records relating to the Hunts, as well as any transactions with respect to loans secured by silver or silver futures contracts. In addition the subpoena called for the production of documents and records relating to credit extended to certain brokerage houses. At that time, a Mr. A. Robert Abboud was Chairman of the First National Bank of Chicago. First Chicago Corporation is the parent holding company of First National Bank in Chicago. At some time subsequent to the issuance of the subpoena, Abboud was no longer Chairman of First in Chicago. As a consequence, the SEC issued a subpoena to Abboud which requested him to appear and give testimony related to the April, 1980 subpoena duces tecum. Abboud's deposition was scheduled to take place on January 19, 1981. Ken Lay assumed the responsibility for obtaining Abboud's oral testimony.

Prior to the testimony of Abboud, Lay became concerned about the possible applicability of the RFPA to Abboud's testimony, even though he was no longer employed by the bank. Lay consulted with Thomas Hamill, Chief Counsel of the Commission's Division of Enforcement, and with Levine concerning the matter. Realizing that Abboud's expected oral testimony would relate to matters contained in records received prior to the effective date of the RFPA, Lay and Hamill considered whether any notice was required. They determined that because a portion of Abboud's oral testimony might relate to customer financial information of certain of the Hunt's other than that contained in the documents received from First National Bank pursuant to the April, 1980 subpoena, it would be best to provide notice to those concerning whose banking relationship Abboud would be questioned.

Accordingly, by letters dated January 2, 1981, Lay informed counsel for W. H. Hunt, N. B. Hunt and Lamar Hunt that the SEC planned to depose Abboud, former chairman of First of Chicago, and that he would be asked to testify concerning personal financial records of plaintiffs that had been subpoenaed from First of Chicago on April 16, 1980. The letters to each plaintiff enclosed a "Customer Consent and Authorization for Access to Financial Records," a "Statement of Customer Rights under the

Right to Financial Privacy Act of 1978," and what appeared to be the cover page and attachment of the April 16, 1980, subpoena issued to First of Chicago. These plaintiffs were requested to sign the customer consents.

In preparing the attachments to the First of Chicago subpoena enclosed in his letters of January 2, 1981, Lay intentionally deleted portions of the attachment that had actually been served on First of Chicago. These letters did not state that portions of the attachment had been deleted, and Lay did not inform the three plaintiffs or their counsel of this fact.

The only indication in the letters that portions of the attachment had been deleted was a vague reference to the "relevant portion" of the subpoena attachment. The portions of the attachment which were deleted related to extensions of credit or loans to certain brokerage houses, named in the original subpoena.

Plaintiffs N. B. Hunt, W. H. Hunt and Lamar Hunt each signed a customer consent relating to Abboud's testimony as requested by Lay in his January 2, 1981 letters. None of the three plaintiffs, however, were aware that portions of the original April, 1980 subpoena attachment had been deleted from the notice they received, at the time they executed the consent. Although Lay discussed the matter of Abboud's testimony with Levine and Hamill, he did not inform either that he had deleted portions of the subpoena attachment sent to Plaintiffs with the consents. Lay deleted portions of the subpoena attachment and customer notice because he believed that notice as to the deleted material was not required by the RFPA. There is nothing in the subpoena attachment which was sent with the customer notices which would put a reasonable person on notice that portions of the original subpoena attachment had been deleted.

As the scheduled date for the taking of Abboud's testimony approached, Lay had not received the executed consents even though it had been his understanding that they would be forthcoming. Lay asked An-thony Djinis, a member of the SEC staff, to ascertain the status of the consents from the Hunts' counsel. On January 19, 1981, the day for which Abboud's testimony was scheduled to occur, Djinis informed Lay that counsel for the Hunts had indicated that the consents had been executed and would be forthcoming. They had not, however, been received by Lay at the time Abboud's testimony was to commence. Thus, after "going on the record" and asking Abboud some general questions unrelated to the Hunts, Lay, after conferring with Sporkin, decided to adjourn the testimony. Lay did so because he was concerned that, without having the consents in hand, the RFPA would not have been fully and literally complied with. Lay now believes that the Abboud consents signed by the three plaintiffs were defective under the RFPA because the subpoena attachments contained deletions.

2. *The First National (International) Bancshares, Inc. Subpoena and Notice.*

In furtherance of the SEC investigation Gail Vance served a subpoena duces tecum, dated February 19, 1981, upon First International Bancshares, Inc., the parent holding company of First National Bank of Dallas. The February 19, 1981 subpoena was erroneously addressed to "First National Bancshares, Inc." as a result of a typographical error. Vance did not proof read the subpoena before issuing it and did not then discover the error. The subpoena and attachment called for the production of the following documents, and included the following definitions:

### ATTACHMENT

A. This subpoena covers all documents described below in the possession ·of the addressee of this subpoena, or subject to his custody or control.

B. Unless the context indicates otherwise, the following words and phrases are defined and used herein as follows:

(1) "Document" or "Documents" refer to all written or graphic matter, however produced or reproduced, or to any other

tangible permanent record, and without limitation, shall include, among other things, all letters, correspondence, records, memoranda, minutes, notes, summaries, telephone records, bank checks, bank deposit slips, bank credit and debit memoranda, bank drafts, bank statements, books, schedules, reports, studies, appraisals, analyses, lists, surveys, budgets, financial statements, financial projections, financial calculations, contracts, agreements, periodicals, charts, graphs, interviews, speeches, transcripts, depositions, press releases, brochures, books of account, telegrams, notes and minutes of meetings of directors or other meetings, interoffice communications, results of investigations, working papers, computer data, maps, papers similar to any of the foregoing, and other writings of every kind and description (whether or not actually used, and including drafts of all documents), and including not only originals of such documents but all photostatic or microfilmed copies in whatever form, and all sound recordings in whatever form.

(2) A document or communication "relating or incident to" a given subject matter means any document or communication that constitutes, contains, embodies, comprises, reflects, identifies, states, refers to, deals with, comments on, responds to, describes, analyzes, or is in any way pertinent to that subject, including, without limitation, documents concerning the presentation of other documents.

(3) The term "Hunts" as used herein means Nelson Bunker Hunt, William Herbert Hunt, Houston B. Hunt, Lamar Hunt, Albert Huddelston, Douglas H. Hunt, and each of them, and sole proprietorships, corporations, partnerships and other ventures controlled by them, including but not limited to International Metals Investment Company, Ltd., Hunt Minerals International Ltd., Hunt International, Hunt International Resources Co., Hunt Energy Corp., Hunt Holdings Inc., Placid Oil Co., Planet Investment Corp., Penrod Drilling, Great Western Sugar Co., Western Investment, Inc., Third

Crescent Investment Co., and Excellor Group, and their officers, directors, affiliates, predecessors, successors, subsidiaries and joint ventures in which they are principals and each of them.

(4) The term "Engelhard" as used herein means Engelhard Mineral and Chemicals Corporation, and its officers, directors, affiliates, predecessors, successors, subsidiaries and joint ventures in which they are participants, and each of them.

(5) The term "IMIC" as used herein means International Metals Investment Co., Ltd., and its officers, directors, affiliates, predecessors, successors, subsidiaries, and joint ventures in which they are participants, and each of them.

(6) The term "ACLI International, Inc." as used herein includes its officers, representatives, directors, agents, affiliates, predecessors, successors, subsidiaries and joint ventures in which they are participants, and each of them.

(7) The term "the Bank" as used herein means the addressee of this subpoena and its parents, subsidiaries, affiliates, predecessors, successors, officers, directors, agents, representatives, and joint ventures in which they are participants, and each of them.

### DOCUMENTS TO BE PRODUCED

For the period July 1, 1979, to the present, all documents not already produced relating or incident to the following:

A. All contemplated, requested proposed or executed loans, advances, guarantees, extensions of credit or other forms of credit extended or arranged by the Bank or to which the Bank was directly or indirectly a party or a participant, in amounts greater than $250,000, to or for the benefit of the Hunts.

B. All proposed or executed loans, advances, guarantees, extensions of credit or other forms of credit, extended or arranged by the Bank, or to which the Bank was directly a party or a partici-

pant, in amounts greater than $250,000, to or for the benefit of:

(i) Engelhard

(ii) ACLI International, Inc.

(iii) IMIC

C. The financial condition of the Hunts, including but not limited to all financial statements, balance sheets and audits of the Hunts furnished, provided, issued or otherwise transmitted by the Hunts, their agents, employees, or other persons acting for or on their behalf, or otherwise obtained.

D. All proposed or executed contracts, agreements, arrangements, understandings or other relationships between or among the Bank and the Hunts.

E. All conferences, meetings, conversations, discussions, correspondence or other communications between or among the Bank and others, including but not limited to the Hunts concerning (A), (B), (C), or (D) above.

The customer notices sent to all six plaintiffs in connection with the February 19th, 1981 subpoena contained a materially different subpoena and attachment. The subpoena and attachment which plaintiffs received a copy of was dated February 18, 1981. Although Vance was aware that the date on the subpoenas included in plaintiffs' customer notices was different from the date on the actual subpoena, she did not correct the error because she wanted to avoid the resulting inconvenience and delay. Further, substantial portions of the attachment to the February 19th, 1981 subpoena had been deleted, and plaintiffs received an excised version as follows:

### ATTACHMENT

A. This subpoena covers all documents described below in the possession of the addressee of this subpoena, or subject to his custody or control.

B. Unless the context indicates otherwise, the following words and phrases are defined and used herein as follows:

(1) "Document" or "Documents" refer to all written or graphic matter, however produced or reproduced, or to any other tangible permanent record, and without limitation, shall include, among other things, all letters, correspondence, records, memoranda, minutes, notes, summaries, telephone records, bank checks, bank deposit slips, bank credit and debit memoranda, bank drafts, bank statements, books, schedules, reports, studies, appraisals, analyses, lists, surveys, budgets, financial statements, financial projections, financial calculations, contracts, agreements, periodicals, charts, graphs, interviews, speeches, transcripts, depositions, press releases, brochures, books of account, telegrams, notes and minutes of meetings of directors or other meetings, interoffice communications, results of investigations, working papers, computer data, maps, papers similar to any of the foregoing, and other writings of every kind and description (whether or not actually used, and including drafts of all documents), and including not only originals of such documents but all photostatic or microfilmed copies in whatever form, and all sound recordings in whatever form.

(2) A document or communication "relating or incident to" a given subject matter means any document or communication that constitutes, contains, embodies, comprises, reflects, identifies, states, refers to, deals with, comments on, responds to, describes, analyzes, or is in any way pertinent to that subject, including, without limitation, documents concerning the presentation of other documents.

(3) The term "Hunts" as used herein means Nelson Bunker Hunt, William Herbert Hunt, Houston B. Hunt, Lamar Hunt, Albert Huddelston, Douglas H. Hunt.

(7) The term "the Bank" as used herein means the addressee of this subpoena and its parents, subsidiaries, affiliates, predecessors, successors, officers, directors, agents, representatives, and joint ventures in which they are participants, and each of them.

## DOCUMENTS TO BE PRODUCED

For the period July 1, 1979, to the present, all documents not already produced relating or incident to the following:

A. All contemplated, requested proposed or executed loans, advances, guarantees, extensions of credit or other forms of credit extended or arranged by the Bank or to which the Bank was directly or indirectly a party or a participant, in amounts greater than $250,000, to or for the benefit of the Hunts.

C. The financial condition of the Hunts, including but not limited to all financial statements, balance sheets and audits of the Hunts furnished, provided, issued or otherwise transmitted by the Hunts, their agents, employees, or other persons acting for or on their behalf, or otherwise obtained.

D. All proposed or executed contracts, agreements, arrangements, understandings or other relationships between or among the Bank and the Hunts.

E. All conferences, meetings, conversations, discussions, correspondence or other communications between or among the Bank and others, including but not limited to the Hunts concerning (A); (B); (C), or (D) above.

The SEC staff never served a complete copy of the February 19, 1981 subpoena to plaintiffs.

The customer notice sent to plaintiffs with respect to the February 19, 1981 subpoena states that the SEC is seeking financial records to determine whether there have been any violations of the Securities Act of 1933, the "Securities Exchange of 1934," the Public Utility Holding Company Act of 1935, the "Trust Act [sic] Indenture Act of 1939," the Investment Company Act of 1940, and the Investment Advisers Act of 1940. The Amended Order of Investigation pertinent to HO–1233 refers only to potential violations of the Exchange Act of 1934. The customer notices which Vance sent to plaintiffs is a form notice which is merely attached to the rest of the papers sent to plaintiffs. With the exception of Vance,

the SEC staff now concedes that the mere listing of six statutes in the SEC's customer notices does not adequately describe the nature of the agency's law enforcement inquiry.

Vance intentionally deleted portions of the subpoena attachment in the notice version of the subpoena served on plaintiffs at Lay's instruction. The deleted portions of the February 19, 1981 subpoena called for the production of records pertaining to plaintiffs, the partnership of Hunt-Stephens, and other persons who may be customers under the RFPA. In addition, the February 19, 1981 subpoena calls for production of financial records pertaining to the "Hunts"—the term "Hunts" is defined to include not only plaintiffs but also "sole proprietorships, corporations, partnerships, and other ventures controlled by them," including thirteen specified entities, "and their officers, directors, affiliates, predecessors, subsidiaries and joint ventures in which they are principals and each of them." The SEC did not furnish customer notices to any persons or entities other than plaintiffs in connection with the February 19, 1981 subpoena. Officers and directors of the corporations referred to in the subpoena may be entitled to customer notice under the RFPA if they are "customers" of the financial institution to which the subpoena was directed. Vance, however, did not determine who these individuals were prior to issuing the subpoena and never considered giving them customer notice. A number of individuals other than plaintiffs served as officers and directors of the corporations and other entities referred to in the subpoena. Further, at the time she issued the subpoena and the excised versions thereof, in the customer notices to plaintiffs, Vance did not know whether some of the entities referred to in the subpoenas were partnerships of five or fewer individuals, and she made no effort to obtain that information.

Vance's and Lay's reason for deleting portions of the subpoena in the customer notice was that they believed the RFPA did not require notice with respect to the mate-

rials sought by the deleted portions. In preparing the customer notice, Vance did not retype the attachment to eliminate the gaps created by the omissions, but rather photocopied the complete attachment with white paper over the omitted areas. Thus, there are large gaps in the version of the subpoena and attachment which plaintiffs received. Despite the presence of the gaps in the attachment to the subpoena sent with the customer notice, there is nothing in the customer notice which would put a reasonable person on notice that portions of the original subpoena had been excised.

On March 2, 1981 plaintiffs notified the SEC of their intention to file a Motion to Quash the February 19, 1981 subpoena pursuant to the RFPA. The SEC declined to withdraw the subpoena and the same day plaintiffs filed their motion with this Court. Subsequently, on May 9, 1981, the SEC decided to withdraw the subpoena and so notified this Court. The SEC did not receive any of the documents requested in the subpoena.

### 3. *The Republic and Citibank Subpoenas*

Approximately a week after the First National subpoena and customer notice were issued by Vance, she served subpoenas duces tecum upon Republic and Citibank seeking financial records of the plaintiffs. The actual subpoenas served on Republic and Citibank, dated February 25, 1981, are exact duplicates of the February 19, 1981 subpoena served on First National with respect to the content of the attachment and the documents requested. Once again, however, the customer notices served on plaintiffs contain a materially different subpoena and attachment.

First, in the customer notices sent to plaintiffs, Vance included only one attachment for both of the subpoenas. As stated above, the attachment for each of the First National, Republic and Citibank subpoenas are exact duplicates. Each subpoena refers to an "attachment". Vance decided to send the two subpoenas with only one attachment since the attachment to each was exactly the same. She believed plaintiffs would understand that the sole attachment

referred to both subpoenas. Vance had previously contacted plaintiffs' attorneys and been instructed to serve the customer notice upon the attorneys and not plaintiffs.

Once again, Vance intentionally excised the same portions of the attachment sent in the customer notice. And once again, the deleted portions appear to call for production of not only the plaintiffs' financial records, but also the records of other persons and entities which might be "customers" under the RFPA. Vance did not know at the time she deleted portions of the attachment whether any of the entities referred to in the subpoena were either partnerships of five or fewer individuals, and hence "customers" entitled to notice under the RFPA. Further, due to the breadth of the definitions of the entities referred to in the subpoenas, which were deleted in the notices, the subpoenas conceivably called for the production of other individuals' records who may be "customers" as that term is defined in the RFPA. It is undisputed that neither Vance nor any staff member at the SEC considered furnishing customer notices to any persons or entities other than plaintiffs.

Finally, once again, the Republic and Citibank customer notices state that the SEC is seeking financial records to determine whether there have been violations of the Securities Act of 1933, "the Securities Exchange of 1934" the Public Utility Holding Company Act of 1935, the "Trust Indenture Act of 1939," the Investment Company Act of 1940, and the Investment Advisers Act of 1940. As I recounted above, for the most part the SEC now concedes that the mere listing of these six statutes in the SEC's customer notices inadequately describes the nature of the agency's law enforcement inquiry.

### 4. *The "Update Letters"*

In April of 1980, the SEC, pursuant to its investigation, issued subpoenas to four banks seeking production of financial information relating to HO–1233. As stated above, one of the purposes of the SEC investigation was to examine possible failures by certain public corporations, including

bank holding companies, to report the risk posed by loans used to purchase or pay for obligations incurred in connection with the Hunts' silver activities. The April, 1980 subpoenas were addressed to First of Chicago, Royal Bank, Chemical Bank and Bankers Trust Company. All four subpoenas call for the production of documents existing as of the dates of the subpoenas, April 16, 1980. None purport to impose any continuing obligation on the banks to produce documentation subsequent to the date of the subpoena.

Subsequent to April, 1980, the Hunts refinanced their silver debts through a $1.1 billion loan obtained by Placid Oil Company from a group of banks ("the Placid loan"). As a consequence, W. H. Hunt, N. B. Hunt and Lamar Hunt, as guarantors of the loan, furnished information to Placid Oil Company which was to be provided to this consortium of banks. Some of this financial information was made public, and there is a copy of the Placid loan agreement in the Rosenthal Report.

When Vance was assigned to the investigation in late January, 1981, Lay instructed her to gather facts related specifically to the exposure of banking institutions arising out of the Hunt silver transactions. With respect to the Placid loan, Lay instructed Vance to examine the information which had been received as a result of the April, 1980 subpoenas, and to determine whether the SEC had received information relating to the Placid loan from all the participating banks. Lay also instructed her to determine whether such production was "complete." Vance reviewed the loan agreement in the Rosenthal Report, and the indices and transmittal letters accompanying the document production by those banks under the April 1980 subpoenas. In a February 12, 1981 memorandum to Lay, Vance reported that four banks participating in the Placid loan which had been subpoenaed in April, 1980, may not have furnished all available information concerning the loan: First of Chicago, Royal Bank, Bankers Trust Company, and Chemical Bank. All but one of these banks—Royal Bank—are owned by publicly held companies.

As a consequence of Vance's report, and at Lay's instruction, Vance prepared letters addressed to the four banks requesting among other things, "updated" information relating to the "Placid Loan." All four letters contained the same request:

Dear Sir:

On April 16, 1980 the Securities and Exchange Commission issued a subpoena duces tecum to the bank requesting all documentation relating to the Hunts, silver loans and loans to various brokers-dealers. We understand that since that time the bank participated in a $1.1 billion loan to Placid Oil Company (the "Placid loan"). To the extent not already provided, please update the production by providing additional documentation, as described in the subpoena, relating to the bank's participation in the Placid loan. Specifically, we seek all documentation concerning the inception of the credit, all communications with any persons concerning the credit, all notes or memoranda of meeting of any nature or with any persons concerning loans to Placid or others of the Hunts. Documentation shall include documents and summaries prepared by bank officers and employees concerning the credit; it shall also include documents relating to the financial obligations and condition of the Hunts themselves, all documentation concerning the use of proceeds of any "bridge" loans and of the Placid loan itself. Supply in addition all documents concerning the bank's response to the Federal Reserve's October 6, 1979 guidelines concerning lending for speculative purposes. Documentation to be provided should *not* include the executed or other final copies of the Placid loan, executed revolving credit agreement of April 28, 1980 entered into among Placid Oil, FNB–Dallas, Morgan Guaranty Trust, et al.; the Agreement of Limited Partnership of Placid Investments, Ltd., Placid Investment Company and N. B. & W. H. Hunt dated April 28, 1978; and the documentation of collateral supporting the loan. Production *shall* include all preliminary drafts of the "anti-

speculation" clause ultimately embodied in 96.24 of the Revolving Credit Agreement dated April 28, 1980; 99 ("Covenants") of the Partnership Commitment letter dated May 1, 1980; and Paragraph 16 ("Certain Covenants by the Limited Partnership") in the Agreement of Limited Partnership dated April 28, 1980.

The "Hunts" shall include but not be limited to:

William Herbert Hunt;
Nelson Bunker Hunt;
Douglas H. Hunt;
Lyda Bunker Hunt;
Mary Huddleston;
Albert Huddleston;
Lamar Hunt;
Houston Hunt;
Paul William Flowers;
Ellen Hunt Flowers and members of their families;

The term "Hunts" shall also include entities which had loans outstanding to the Hunt individuals (as such documents relate to the matters described above) and shall include but not be limited to:

Engelhard;
ACI;
HEC;
Pentad;
Hunt International Finance, N.V.;
Cargill;
Bache;
Merrill Lynch;
Paine Webber;
E. F. Hutton;
Swiss Bank Corp.;
Credit Lyonnais;
J. Henry Schroder Bank and Trust Co.;
Continental Illinois National Bank and Trust of Chicago;
First National Bank of Chicago;
Trade Development Bank (Luxembourg);
Dresdner Bank A.G.;
Marine Midland;
Berliner Hendell (BHF Bank);

Citibank N.A.;
Chemical Bank;
Bank Populaire Suisse;
Royal Bank of Canada;
Manufacturers Hanover;
Chase Manhattan Bank;
First National Bank-Dallas;
Standard Chartered Bank, Ltd.;
Irving Trust Company;
Barclays Bank;
First National Bank and Trust of Oklahoma City;
Harris Trust and Savings Bank;
Bankers Trust Company;
Citizens and Southern National Bank;
Northern Trust;
Morgan Guaranty Trust Company;
Security Pacific National Bank;
United States Trust Co.;
Bank of America and Republic National Bank of Dallas.

It is perfectly clear from the first three sentences of the letters that Lay and Vance sought production of documents and information generated subsequent to April 16, 1980. Likewise, it is clear that the April, 1980 subpoenas imposed no "continuing production" duty on the banks. In addition, the request and related definitions purport to request production of the financial records and documents of the plaintiffs, as well as other individuals.[5] It is undisputed that no customer notices were sent with respect to the "update letters" to anyone.

Prior to issuing the letters Vance prepared a draft letter. Lay reviewed it, made changes, and suggested others. During the preparation of the letters, Lay and Vance discussed whether the RFPA was applicable to the records sought. They concluded that the RFPA did not apply because they believed that the letters requested only financial records from the account of Placid Oil Company—a corporation. At the time Vance was drafting the letters, she attempted to seek the advice of Tom Hamill, Chief Counsel for the Division of Enforce-

---

**5.** For instance the term "Hunts" is defined in the update letters to include the Plaintiffs, other named relatives of the Plaintiffs, "and members of their families."

ment, as to whether a "continuing production" letter required customer notice under the RFPA. Hamill advised Vance that such notice was necessary. When Vance informed Lay of Hamill's opinion, however, Lay claimed that Hamill had given him a contrary opinion. Vance again consulted with Hamill, who denied advising Lay that "continuing production" letters did not require customer notice. Vance advised Lay of this. Nevertheless, Vance and Lay concluded that notice was not required for the independent reason which is set forth above—that the letters sought only information from the Placid Oil Company account, a corporation not entitled to notice under the RFPA.

Early on, the SEC, in response to Plaintiffs' Request for Admissions, took the position that no customer notice was required under the RFPA with respect to the update letters. Since then, however, Vance and Lay have stated that the letters are inartfully drafted and "can be read" to request production of records from the accounts of individual customers, including Plaintiffs. Accordingly, Vance, Lay and Levine agree that the letters either should not have been sent, or that customer notice should have been provided.

Subsequent to the filing of Plaintiffs' Motion to Quash directed at the First in Dallas subpoena, dated March 2, 1981, Stanley Sporkin, Director of the Division of Enforcement, learned of the update letters and immediately ordered them to be withdrawn. On March 10, 1981 the SEC withdrew the letters by telephone, and by letter of March 11, 1981 confirmed the withdrawals. The four update letters were withdrawn before the SEC received any documents from the four banks.

### 5. Collateral Matters

Aside from the main incidents to which this litigation is directed, which I have discussed above, the evidence has raised two distinct collateral matters. First, Plaintiffs have suggested, and attempted to prove, that the SEC has made oral requests of financial institutions for information concerning Plaintiffs' accounts after the effec-

tive date of the RFPA. Second, Plaintiffs have likewise suggested and attempted to prove that the SEC, and its staff, have improperly conveyed information relating to plaintiffs' relationships with financial institutions to other agencies and parties.

### a. Oral Requests for Financial Information

There is some evidence in the record to suggest that SEC staff employees have orally, via telephone conversations with the financial institutions involved in the instant case, sought the production of financial documents pertaining to Plaintiffs after November 10, 1980. There is no evidence, however, to suggest that any of these requests related to any documentation which was not already subject to an outstanding subpoena directed at the particular financial institution. With respect to these conversations, however, no customer notice was given.

In particular, Lay communicated with the representatives of Morgan Guaranty Bank with regard to financial information relating to the plaintiffs after the affected date of RFPA. The conversation related to documents called for by an outstanding subpoena addressed to Morgan Guaranty Bank which was issued prior to the effective date of the RFPA. There is no evidence to suggest that Lay sought production of financial records relating to Plaintiffs which were not already the subject of the outstanding subpoena.

### b. Transfers of Financial Information by the SEC

Although the present state of the record reveals that there has been an ongoing and continuous exchange of information between the SEC and the CFTC in connection with the SEC investigation, there is no evidence to suggest that the SEC has passed on specific financial information relating to Plaintiffs to the CFTC after the effective date of the RFPA. There is evidence which suggests that on numerous occasions SEC staff employees have discussed the investigation with non-SEC persons. There is no evidence, however, that these discussions included remarks concerning financial in-

formation about the Plaintiffs received by the SEC in the course of its investigation.

On numerous occasions, Plaintiffs and banks which have provided Plaintiffs' financial records to the SEC have sought assurances that the SEC will not disclose any such non-public information or records to third parties. Not surprisingly, the SEC has responded to these confidentiality requests in its usual fashion with a form letter. The letter states that the issue of confidentiality can only be resolved each time a request for disclosure is made under the Freedom of Information Act, 5 U.S.C. § 552 *et seq.* It goes on to state that, nonetheless, the SEC would give the request careful consideration, and attempt to keep the applicant apprised of any requests for the information under FOIA. Finally, the letter advises the applicant of various circumstances under which the material may be released to third parties without notice to the applicant. Attached to the letter is a form list of these routine uses, including among others the following two routine uses:

"1. To coordinate law enforcement activities between the SEC and other federal, state, local or foreign law enforcement agencies, and securities self-regulatory organizations.

. . . . .

19. To respond to inquiries from Members of Congress the press and the public which relate to specific matters that the Commission has investigated and to matters under the Commission's jurisdiction."

In addition to the multitude of requests for confidentiality, Plaintiffs proposed a confidentiality stipulation with the SEC which was rejected. To date, the only assurance the SEC has provided Plaintiffs concerning the financial information they have gathered is that the SEC will attempt to notify Plaintiffs of any FOIA request for the information.

## F. REPENTANCE AND REFORM

In September 1977, when the bill that resulted in the enactment of the RFPA was introduced, the SEC became involved in the legislative process to raise certain questions concerning the Act's potential application. When the RFPA was passed on November 10, 1978, the SEC was excluded from its coverage for a two-year period because of the Act's peculiar effect upon it. Even though the SEC was not subject to the RFPA, it circulated a memorandum to all of its regional offices and supervisory personnel in the Division of Enforcement attaching a copy of the RFPA and the Department of Justice's RFPA memorandum to alert them to the provisions of the new Act. A monitoring system was also established to track financial information obtained by the SEC as if the RFPA applied to the Commission. During this period, the SEC contacted 20 other agencies in an effort to draw on their experience in preparing for the RFPA, but none was helpful because other agencies did not make the same use of subpoenas under the Act which the SEC would. As the close of the two-year exemptive period neared, the SEC again became active in the legislative process to emphasize its unique position and to seek exemptive relief from the full impact of the RFPA. Before the RFPA became effective as to the Commission, the not to subpoena information covered by the RFPA until further instructions were received concerning its application.

When the RFPA became effective with respect to the SEC on November 10, 1980, in Public Law 96–433, the SEC was provided an alternative to the RFPA, which was enacted as Section 21(h) of the Securities Act.[5A] Leading up to the effective date of

---

**5A.** 15 U.S.C. § 78u(h). It is undisputed that none of the requests for banking records in issue here were made pursuant to section 21(h). This recent amendment to the Exchange Act allows the SEC to obtain access to a customer's financial records without notice to a customer upon an ex parte showing to an appropriate United States district court that

"(A) delay in obtaining access to such financial records, or the required notice, will result in—

(i) flight from prosecution;

the RFPA, the SEC prepared an extensive memorandum to educate its staff on the RFPA. When the RFPA became effective, this memorandum ("RFPA Manual") was circulated to the SEC's staff, setting forth procedures and forms to be utilized in order to comply with the RFPA.

After the RFPA Manual was issued to the staff, a training conference was held to explain the RFPA and the RFPA Manual to staff members. The primary author of the RFPA Manual participated, as did Levine. The session lasted two hours and provided a question and answer session. The chief enforcement attorneys of all the SEC's regional offices attended a separate training conference where the RFPA was explained.

The instant litigation has mushroomed out of Plaintiffs' original March 2, 1981 Motion to Quash the First in Dallas subpoena. Prior to filing the motion, counsel for Plaintiffs, conferred with Gail Vance with respect to their objections to the subpoena. At that time Plaintiffs objected to the subpoena on four grounds:

1. that the subpoena appeared to be addressed to First National Bancshares as opposed to First International Bancshares;

2. that the subpoena failed to adequately describe the records sought;

3. that the records requested were not reasonably related to a legitimate law enforcement inquiry; and

4. that the confidential and sensitive nature of the documents sought demanded that the subpoena be enforced only in conjunction with a protective order preserving confidentiality.

Plaintiffs did not, at this time, object to the exclusions in the attachment they received in the customer notice because they had not yet seen the original subpoena. Subsequent to the filing of the motion to quash, Ralph Ferrara, General Counsel with the SEC, and Stanley Sporkin, then Director of the Division of Enforcement, discussed the First in Dallas subpoena. Ferrara recommended that it should be withdrawn. Sporkin disagreed because he concluded that the subpoena was in substantial compliance with the RFPA.

On March 9, counsel for Plaintiffs contacted the SEC requesting that the Republic and Citibank subpoenas be withdrawn. By this time, both Plaintiffs and the SEC were aware of the excisions of the attachment in the customer notice. On the same day Sporkin conducted a hearing concerning possible legal challenges to the subpoenas. It was decided that the subpoenas to Citibank, Republic, and First in Dallas should be withdrawn. Sporkin decided it would be best to attempt to seek the direct testimony of the Hunts concerning their financial records so as to obviate the need to further subpoena any financial institutions. Thus, on March 9 Plaintiffs were

(ii) destruction of or tampering with evidence;
(iii) transfer of assets or records outside the territorial limits of the United States;
(iv) improper conversion of investor assets; or
(v) impeding the ability of the Commission to identify or trace the source or disposition of funds involved in any securities transaction;
(B) such financial records are necessary to identify or trace the record or beneficial ownership interest in any security;
(C) the acts, practices or course of conduct under investigation involve—
(i) the dissemination of materially false or misleading information concerning any security, issuer, or market, or the failure to make disclosures required under the securities laws, which remain uncorrected; or

(ii) a financial loss to investors or other persons protected under the securities laws which remains substantially uncompensated; or
(D) the acts, practices or course of conduct under investigation—
(i) involve significant financial speculation in securities; or
(ii) endanger the stability of any financial or investment intermediary."
Because the SEC did not utilize this alternative to the RFPA with respecct to the requests for financial information which are in issue here, I intimate no opinion with respect to the proper construction of the statute. Subsection (11) of section 21(h) specifically authorizes the Commission to "obtain financial records from a financial institution or transfer such records in accordance with provisions of the Right to Financial Privacy Act of 1978."

advised that these three subpoenas had been withdrawn. On March 10, 1981, Sporkin learned of the outstanding "update letters" and immediately ordered their withdrawal. The same day the four banks who received update letters were informed by the SEC that the letters had been withdrawn. All four update letters, as well as the First in Dallas, Citibank, and Republic subpoenas were withdrawn before the SEC received any of the requested documents from the banks. No certificate of compliance pursuant to section 3403 of the RFPA was ever prepared or issued.

On March 24, 1981 Plaintiffs withdrew their motion to quash and filed the instant complaint for injunctive relief. After Plaintiffs' RFPA claim survived Defendant's motion to dismiss, the Court put the parties on an expedited discovery schedule. In response to Plaintiffs' Request for Admissions, the Defendant SEC as of April 15, 1981 denied that it had failed to comply with the RFPA with respect to the First in Dallas, Citibank, and Republic subpoenas. The SEC stated it had "substantially complied with the RFPA" in issuing the subpoenas. The SEC also denied that it had failed to comply with the RFPA with respect to the update letters, stating that it was not required to provide notice with respect to those letters.

Subsequent to the inception of this lawsuit the staff-members of the SEC involved in the requests for financial information at issue have been admonished by their supervisors in the Division of Enforcement. In particular, Ken Lay has been reprimanded by Stanley Sporkin for failing to perform his job properly. Gail Vance is also aware that her supervisors are displeased with her performance with reference to the matters in issue. In addition, Ferrara has directed the SEC's Ethics Officer, Myrna Siegel, to review the transcripts of the testimony given in this case and the Director of Personnel has been advised of the matter. The SEC, however, has declined the Plaintiffs' request that some of the Bache Team employees be removed from participation in the investigation. Finally, both Lay and Vance have admitted that the subpoenas and update letters should not have issued.

Also subsequent to the inception of this litigation, the SEC has assigned Ivan Borowski, a senior enforcement official, to be in charge of the day to day administration of the SEC investigation, in consultation and coordination with Levine, and to supervise the subordinate staff members assigned to the case. In particular, Borowski will be responsible for all RFPA matters which may arise in the investigation, including approval of all requests to financial institutions for information. He will also determine the staffing of the investigation in consultation with the Director of the Division and Levine.

In March, 1981, the SEC conducted another training seminar at which the RFPA Manual, as supplemented, was discussed.

Since the issuance of the RFPA Manual in November, 1980, four revisions to that manual have been prepared and provided to the staff. On February 2, 1981, the SEC's customer notice forms were revised to inform the customer of the alternative choices of venue for bringing a challenge to an administrative subpoena under Section 1110. The SEC manual was revised again on March 2, 1981, to include notice to a subpoenaed financial institution that it must submit an itemized bill in order to be reimbursed for its costs of compliance with the subpoena. The SEC's customer notice forms were amended again on April 4, 1981, to provide customers with notice of the specific statutes and regulations involved in the particular law enforcement inquiry pursuant to which their financial records are subpoenaed. A fourth revision to the SEC's RFPA procedures was issued on April 21, 1981. That amendment cautioned against sending subpoenas to banks to request the account records of more than one customer, since that practice may lead to a conflict between the privacy interests of the customers and the RFPA procedure of providing customers with the text of the subpoena. In those instances where a subpoena is sent requesting the account records of more than one customer, the SEC's staff is in-

structed not to delete any portions of the subpoena or its attachment which is included in the customer notice. The revision stressed the importance of consulting with the Division of Enforcement's Chief Counsel in any situation in which the sample forms of the manual might not fully apply and invited suggestions where the forms generally could be improved. This revision also advised the staff to draft subpoenas for bank records as narrowly as possible, consistent with the legitimate law enforcement interests of the SEC in the matter. To that end, the staff is advised to only subpoena the information certain to be needed at that particular time, and to send subsequent subpoenas should additional information become necessary. With respect to seeking updated information, the staff is specifically instructed to seek such additional information from banks only (1) pursuant to another subpoena in compliance with the RFPA; (2) pursuant to an applicable exemption from the RFPA; (3) otherwise in compliance with the RFPA or Section 21(h) of the Securities and Exchange Act. The revision instructs the staff to obtain the customer account identification information under section 3413(g) of the RFPA only pursuant to a subpoena. Finally, it reminds the staff of the SEC's policy that all subpoenas to financial institutions be approved, in writing if practicable, prior to issuance, by a supervisor functioning at the level of Assistant Regional Administrator or Assistant Director of the Division of Enforcement.[6]

## II. THE RIGHT TO FINANCIAL PRIVACY ACT

Congress enacted the Right to Financial Privacy Act in 1978 in response to *United States v. Miller*, 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976) in which the Supreme Court held that a customer of a financial institution has no standing under the

Fourth Amendment of the Constitution to contest government access to his financial records. H.R.Rep.No.1383 95th Cong. 2nd. Sess. 33, *reprinted in* (1978) U.S.Code Cong. & Ad.News 9273, 9306 (*hereinafter* H.R. Rep.No.1383). Although the Court in *Miller* recognized the sensitive nature of a banking customer's financial records, it concluded that since the records are the property of the financial institution, the customer has no recognizable privacy interest in them. 425 U.S. at 440–441, 96 S.Ct. at 1622–23. Congress nevertheless, noting that the Fourth Amendment does not prevent or advise against legislative or executive efforts to establish nonconstitutional protections against possible abuse, *see Zurcher v. Stanford Daily*, 436 U.S. 547, 567, 98 S.Ct. 1970, 1982, 56 L.Ed.2d 525 (1978), enacted the RFPA with substantial input on the part of the law enforcement agencies. H.R. Rep.No.1383 at 4. In so doing, Congress and most law enforcement agencies held the belief that privacy protection and effective law enforcement were compatible. *Id.*

The basic thrust of the Act is that customers of financial institutions are entitled to notice of any government request for their financial records and an opportunity to challenge the request. Under the Act, "customer" is defined as a person or authorized representative of that person who utilizes the services of a financial institution. The term person is defined to include "an individual or partnership of five or fewer individuals." Section 3402 of the Act states the general rule that no Government authority may have access to the financial records (or any information derived therefrom) unless the government's request reasonably describes the records sought and either

1. the customer has consented to such disclosure (section 3404);

---

**6.** At the time that the excised customer notices and update letters were issued by the SEC, the SEC's policy, as reflected by the RFPA Manual, was that "[a]ll subpoenas sent to financial institutions shall be approved, prior to issuance, by a supervisor at least at the level of Assistant Regional Administrator or Assistant Director of the Division of Enforcement." Neither the up-

date letters nor the excised customer notices which were sent to Plaintiffs were ever reviewed by an Assistant Regional Administrator or Assistant Director of the Division of Enforcement. Lay reviewed the materials but at the time of their issuance he had not been appointed to the position of Assistant Director.

2. the government authority has issued an administrative subpoena or summons which meets the requirements of section 3405;

3. the government authority has obtained a search warrant which meets the requirements of section 3406;

4. the government authority has obtained a judicial subpoena which meets the requirements of section 3407; or

5. the government has made a written formal request which meets the requirements of section 3408.

It is not disputed that the only two avenues in question in the instant case are the first two, customer authorization and the administrative subpoena. In addition to the duties which the Act places upon a government authority seeking to obtain a customer's bank records, a concomitant duty is placed upon the customer's financial institution. In particular, section 3403 of the Act states that a financial institution may not provide government access to a customer's records except in accordance with the provisions of the Act. In addition, that section requires a government authority to certify in writing to the financial institution that it has complied with the provisions of the Act before the financial institution may release any of the requested documentation or information.

■ As I noted above, the two aspects of the Act which are in issue here are the use of an administrative subpoena to obtain records from a customer's banking account and customer authorizations. Section 3405 sets out the requirements which a government authority must comply with in order to obtain access to a customer's bank records pursuant to an administrative subpoena:

A Government authority may obtain financial records under section 3402(2) of this title pursuant to an administrative subpoena or summons otherwise authorized by law only if

(1) there is reason to believe that the records sought are relevant to a legitimate law enforcement inquiry;

(2) a copy of the subpoena or summons has been served upon the customer or mailed to his last known address on or before the date on which the subpoena or summons was served on the financial institution together with the following notice which shall state with reasonable specificity the nature of the law enforcement inquiry:

"Records or information concerning your transactions held by the financial institution named in the attached subpoena or summons are being sought by this (agency or department) in accordance with the Right to Financial Privacy Act of 1978 for the following purpose: If you desire that such records or information not be made available, you must:

1. Fill out the accompanying motion paper and sworn statement or write one of your own, stating that you are the customer whose records are being requested by the Government and either giving the reasons you believe that the records are not relevant to the legitimate law enforcement inquiry stated in this notice or any other legal basis for objecting to the release of the records.

2. File the motion and statement by mailing or delivering them to the clerk of any one of the following United States district courts:

3. Serve the Government authority requesting the records by mailing or delivering a copy of your motion and statement to

4. Be prepared to come to court and present your position in further detail.

5. You do not need to have a lawyer, although you may wish to employ one to represent you and protect your rights.

If you do not follow the above procedures, upon the expiration of ten days from the date of service or fourteen days from the date of mailing of this notice, the records or information requested therein will be made available. These records may be transferred to other Government authorities for legitimate law enforcement inquiries, in which event you will be notified after the transfer;" and

(3) ten days have expired from the date of service of the notice or fourteen days have expired from the date of mailing the notice to the customer and within such time period the customer has not filed a sworn statement and motion to quash in an appropriate court, or the customer challenge provisions of section 3410 of this title have been complied with. With respect to the first requirement, "that the records sought are relevant to a legitimate law enforcement inquiry," the legislative history of the Act is clear that the ultimate burden of satisfying this requirement is on the Government. H.R.Rep.No. 1383 at 53. The initial burden of production, however, is on the customer to offer proof of facts which show that either the documents requested have no connection with the subject matter of the investigation, that he has not committed any offense related to the investigation, or that he is the subject of harassment by the requests. *Id. See Hancock v. Marshall*, 86 F.R.D. 209, 211 (D.D.C.1980). Ultimately, however, the burden is on the government authority to show that it has a demonstrable reason to believe the records sought contain information which will aid in a legitimate investigation of violations of law within its jurisdiction. H.R.Rep.No.1383 at 51. The House Report also indicates that the phrase "reason to believe" does not mean any reason, no matter how theoretical or remote, while the phrase "legitimate law enforcement purpose" is intended to impose a standard lower than "probable cause."

■ The next aspect of section 3405 which deserves treatment is the requirement that "a copy of *the* subpoena or summons" be served on the customer. There is nothing in either the Act or its legislative history to indicate that service of an incomplete copy of the subpoena satisfies this requirement. Regardless of whether or not the original subpoena calls for information from the accounts of entities which are not entitled to notice under the RFPA, the customer is entitled to a complete copy of the subpoena under the Act. This construction is not only mandated by the words of the Act, but also accomplishes the salutary purpose of requiring government authorities to particularize, in independent subpoenas, the entities and accounts to which requests for financial information pertain. In sum, subpoenas should be drafted such that either an RFPA notice to a customer is necessary, or it is not.

Section 3405 also requires that the customer notice must state with "reasonable specificity" the nature of the law enforcement inquiry. It is beyond question that a mere recitation of the government authority's statutory jurisdiction is inadequate to achieve compliance with the Act. In the context of the instant case, the logical means by which the SEC could have satisfied this requirement would have been a reference to the Amended Order of Investigation in the notice, together with a listing of the specific statutes [§§ 10(b), 13(a), 13(d), and 15(c) of the Exchange Act] in question.

Finally, I previously noted that section 3402 imposes the requirement that a government authority must "reasonably describe" the financial records which it is seeking if the request falls within the ambit of the RFPA. The legislative history of the Act states quite bluntly that "this term is intended to mean that the records being sought must be described as specifically as possible, and that a blanket request for 'all records' is insufficiently specific." H.R. Rep.No.1383 at 50. Prior to turning to the specific administrative subpoenas which are in question, I note that section 3410 of the Act requires only that a government authority must be in "substantial compliance" with the Act. Section 3410 sets forth the procedures by which a customer may challenge government access to his financial records. Congress intended to insure by virtue of the "substantial compliance" standard that "minor and technical violations of the [Act] are not a basis for denying access" to a customer's records. H.R.Rep.No.1383 at 54.

■ The SEC's attempts to obtain the Plaintiffs' financial records from First in Dallas, Citibank, and Republic in early 1981

do not even arguably approach substantial compliance with the requirements set forth in section 3405. At the outset, I note that although the customer notices fail to state with reasonable specificity the nature of the law enforcement inquiry, the Plaintiffs were well aware of the nature of the law enforcement inquiry in this instance. Therefore, this defect in the customer notices is a mere "technical" defect, at least in the context of the facts of this case. The excisions to the customer notices sent to Plaintiffs do not fare as well. As I have stated above the RFPA requires a government authority to serve upon the customer a complete copy of the subpoena served upon the financial institution. In the instant case the failure to include a complete copy of the original subpoena with the customer notices is particularly glaring since certain of the excised portions of the subpoena relate to the financial records of persons and entities, including Plaintiffs, who are entitled to have notice of the requests under the RFPA. For example, the definition of the term "Hunts" in paragraph B(3) of the original subpoena includes the individual Plaintiffs as well as "sole proprietorships, ..., partnerships and other ventures controlled by them ...." This portion of the original subpoena was excised in the customer notices. Under the DOCUMENTS TO BE PRODUCED caption on the second page of the original subpoena the SEC requests production of documents related to these entities. This request clearly calls for financial records relating to HIPCO and Hunt-Stephens, partnerships of five or fewer individuals, and under the RFPA these two entities are entitled to customer notice. They received no such notice. Any such notice relating to these two entities which Plaintiffs might have received was eliminated by the intentional excisions to the customer notices. In addition, the original subpoena calls for documents of sole proprietorships controlled by the Plaintiffs. The words of the statute do not expressly include sole proprietorships within the ambit of "customers" entitled to notice under the Act. A construction of the word "person" in section 3401 which does not include sole proprietorships, however, has no basis in reality. Section 3401 defines "person" as an individual or a partnership of five or fewer individuals. It would strain the imagination to conclude that Congress intended to afford partnerships of five individuals the protections of the Act, but not sole proprietorships. A sole proprietorship is nothing more than a partnership of one. Thus, sole proprietorships are entitled to notice under the RFPA, and the excisions to the customer notices in question failed to provide the notices required by law. Finally, there remains the issue of whether or not the Republic, Citibank, and First in Dallas subpoenas comply with the general requirement set forth in section 3402 that subpoenas must "reasonably describe" the financial records which are being sought. As I noted above, this requirement imposes upon the government authority the duty to describe the records which are being sought as specifically as possible. It is undisputed that when Gail Vance drafted the subpoenas in question she merely took some form subpoenas which had been used before and "cut and pasted" together some subpoenas. The sheer breadth of the scope of the subpoenas in question cautions against a finding that they were drafted such as to define the records sought as specifically as possible. For example, I question whether paragraphs C, D, and E under the heading DOCUMENTS TO BE PRODUCED satisfy the specificity requirement.

With respect to the update letters, it is clear that the SEC was requesting production of the financial records of the Plaintiffs and that no notice was given. There is simply no provision in the Act which allows for this type of request for financial records. The update letters run afoul of the general rule stated in section 3402 that no government authority may obtain access to a customer's financial records unless the procedures set forth in the remainder of the Act are complied with. Thus, the requests contained in the update letters reduce to no more than a bald attempt on the part of the SEC to skirt the requirements of the Act.

Since no notice was given, it was somewhat fortuitous that the Plaintiffs were able to discover the existence and nature of the update letters.

■■ In the course of the SEC investigation, the SEC obtained customer authorizations from the Plaintiffs relating to the testimony of Abboud. Section 3404 of the RFPA sets forth the requirements which a customer authorization must meet to be effective. The executed authorization must:

(1) authorize disclosure only for a period not in excess of three months;

(2) state that the customer may revoke such authorization at any time before the financial records are disclosed;

(3) identify the records which are sought to be disclosed;

(4) specify the purposes for which, and Government authority to which, such records may be disclosed; and

(5) state the customer's rights under the RFPA.

As I recounted above, in early 1981 the SEC sought to obtain the testimony of Mr. A. Robert Abboud concerning the materials which were the subject of the April, 1980 subpoena issued to First Chicago Corporation, the parent holding company of First National Bank in Chicago. The first issue with respect to the customer authorizations that the Plaintiffs executed is the applicability of the RFPA to Abboud's testimony. The SEC intended to question Abboud concerning the documents subject to a pre-RFPA subpoena which called for the financial records of the Plaintiffs. Section 3401 of the RFPA defines a financial record as "an original of, a copy of, or *information known to have been derived from*, any record held by a financial institution pertaining to a customer's relationship with a financial institution." The plain meaning of the language clearly includes oral testimony relating to a customer's relationship with a bank or financial institution. Thus, I conclude that the SEC was indeed obligated to give notice to the Plaintiffs of the subpoena seeking the testimony of Mr. Abboud. The

next question before the Court is whether the notice which was actually given was sufficient under the requirements of the RFPA. In giving the Plaintiffs notice of the SEC's attempts to obtain the oral testimony of Abboud, Lay sent the Plaintiffs copies of the original April, 1980 subpoena which was addressed to First Chicago Corporation. Lay, however, excised certain portions of the attachment relating to which documents had been requested. It appears that the excised portions do not pertain to the Plaintiffs' financial records at First National Bank of Chicago. Thus, the Plaintiffs were given notice of those requests for information to which they were entitled under the Act.

While the procedure of sending excised copies of subpoenas to customers of financial institutions is improper, I have concluded that the customer notices sent to the Plaintiffs with respect to Mr. Abboud's expected testimony were in substantial compliance with the letter, if not the spirit of the Act.

■■ Having concluded above that oral requests for information pertaining to a customer's banking records fall within the ambit of the RFPA, and that hence notice of such requests to the customer is required, I now address Plaintiffs' contentions regarding the possibility that the SEC may have made such oral requests to financial institutions in the course of their investigation without giving notice to the Plaintiffs. There is no evidence in the record which can be taken to suggest that the SEC and its staff members did anything more than follow up on outstanding subpoenas with phone calls to the financial institutions or their representatives. Further, there is no evidence that the SEC ever received any information beyond the scope of the outstanding subpoenas. Thus, I am compelled to conclude that notice under the Act was unnecessary. If the SEC were, for example, to make oral requests to financial institutions for financial information pertaining to the Plaintiffs which went beyond the scope of an already outstanding subpoena of which proper notice was given, then the

Plaintiffs would be entitled to another notice. Likewise, if the agency had not already subpoenaed the materials or information in question, and made requests to financial institutions for the information, then notice must be given. In the instant case, however, there is no evidence that the SEC sought to do anything but encourage production under existing subpoenas.

 Finally, as I noted above, Plaintiffs attempted to prove that the SEC, and its staff, have improperly conveyed information relating to the Plaintiffs' banking relationships obtained in the course of the investigation to other agencies and parties. These claims are premised upon section 3412 of the RFPA which provides that financial records obtained pursuant to the procedures set forth in the RFPA may not be transferred to another agency or department unless the transferring agency certifies in writing that "there is reason to believe that the records are relevant to a legitimate law enforcement inquiry within the jurisdiction of the receiving agency or department." That section also provides that the customer must be given notice of the proposed transfer of the information which states with reasonable specificity the nature of the law enforcement inquiry, the agency to which the records are to be transferred, which records are to be transferred, and the purpose for which the transfer is made. Subsection (d) of 3412 qualifies this duty, however, with respect to a transfer of financial records from one "supervisory agency" to another. Section 3401 of the Act includes the Securities & Exchange Commission as a supervisory agency. It does not, however, state that the Commodities Futures Trading Commission is a supervisory agency. It is clear, then, that if the SEC were to transfer to the CFTC the Plaintiffs' financial records obtained through the procedures set forth under the RFPA, notice to the Plaintiffs would be required. I have found from the current state of the record, however, that no such transfers have occurred after the effective date of the Act with respect to materials and information obtained through the procedures set forth in the RFPA. Thus, there

have been no violations of the Act in this respect.

In the normal course of events, when a government authority issues an administrative subpoena under section 3405 of the Act and sends notice to the customer, the customer's challenge rights are found in section 3410 of the Act. The challenge procedures set forth in section 3410 "constitute the sole judicial remedy available to a customer to oppose *disclosure* of financial records" under the Act. The SEC maintains that this remedy somehow precludes the instant action for injunctive relief. Although the challenge procedures set forth in section 3410 are the exclusive remedies available to a customer to challenge *disclosure* of financial records under the Act, section 3416 and 3418 of the Act provide other remedies available to a customer to insure that the procedures under the Act are complied with. In particular, section 3416 provides that

"An action to enforce any provision of this chapter may be brought in any appropriate United States district court without regard to the amount in controversy within three years from the date on which the violation occurs or the date of discovery of such violation, whichever is later."

Section 3418 provides that

"In addition to any other remedy contained in this chapter, injunctive relief shall be available to require that the procedures of this chapter are complied with. In the event of any successful action, costs together with reasonable attorney's fees as determined by the court may be determined."

The SEC contends that since it never received any of the information requested in the defective subpoenas and update letters, there have been no "violations" of the Act, and hence injunctive relief is unavailable to the Plaintiffs. I reject this contention because the construction which the SEC urges would not only negate that plain language of section 3418, but also require that a prospective RFPA plaintiff suffer the inju-

ry of unlawful disclosure under the Act prior to seeking injunctive relief. Section 3417 of the Act[7] provides civil penalties when a government authority obtains access to a customer's records in violation of the Act. To make unlawful disclosure of the customer's financial records a prerequisite to injunctive relief would turn traditional principles of equity on their head. The availability of injunctive relief apart from actual unlawful disclosure of the customer's records is especially appropriate in not only the factual context of the instant case, but also the framework of the RFPA. With respect to the instant case, the excised customer notices and update letters threatened to defeat Plaintiffs' challenge rights under the Act. Having received no notice of the requests for financial information, Plaintiffs' section 3410 rights are meaningless. Although a financial institution may not release the financial records of a customer until it has received a written certification from the government authority that the Act has been complied with, there is nothing in the Act which requires a financial institution to notify a customer that his financial records have been released. Further, with respect to the update letters, the agency sought production of the Plaintiffs' financial records without even invoking or complying with the RFPA. It is entirely possible, and even probable that the financial institutions of which the Plaintiffs are customers could have released the records without the Plaintiffs ever having knowledge of the disclosure. Without the availability of injunctive relief then, the entire purpose of the Act is gutted.

With regard to the basic framework of the Act, I note that the initial determination as to whether the RFPA applies to certain government requests for a customer's financial records falls within the province of the requesting government authority. If, as is the case here, the government authority determines that a particular request falls not within the ambit of the Act, then the remainder of the procedures in the Act are not pursued. The agency determines whether the request is governed by the Act, and having concluded on its own that it is not, fails to give the customer notice of the request. As a consequence, the customer's records are or may be released without the customer ever having the opportunity to challenge the request. The initial determination made by the requesting government authority that the RFPA does not apply effectively defeats the customer's challenge rights under the Act. There is a possibility that the actual disclosure of the records may never be disclosed to the customer. If the request was one to which the procedures of the RFPA apply, then the agency has effectively repealed the Act. Therefore, I hold that injunctive relief is available under section 3418 of the Act without regard to whether or not a government authority has actually obtained access to a customer's financial records. I base my holding primarily upon the factors I have noted above, but also note that both sections 3417 and 3418 provide for awards of costs and attorney's fees

---

7. 12 U.S.C. § 3417(a):

"(a) Any agency or department of the United States or financial institution obtaining or disclosing financial records or information contained therein in violation of this chapter is liable to the customer to whom such records relate in an amount equal to the sum of—
(1) $100 without regard to the volume of records involved;
(2) any actual damages sustained by the customer as a result of the disclosure;
(3) such punitive damages as the court may allow, where the violation is found to have been willful or intentional; and
(4) in the case of any successful action to enforce liability under this section, the costs

of the action together with reasonable attorney's fees as determined by the court."

Subsection (b) of section 3417 also provides that when a court finds that an officer or employee of the government authority has "willfully or intentionally" violated the RFPA, the Office of Personnel Management shall promptly initiate a proceeding to determine whether disciplinary action is warranted against the agent or employee primarily responsible for the violation. Because this action is before the Court on a motion for a preliminary injunction, and not a trial on the merits I do not make a finding as the intent or willfulness of any of the SEC staff members involved in the update letters or excised customer notices.

to a successful litigant. If, as the SEC contends, a violation as defined in section 3417 is a prerequisite to injunctive relief under section 3418, the provision in section 3418 for attorney's fees would be redundant.

The SEC's issuance of update letters and excised subpoenas in the instant case represents a dangerous approach towards the relationship between the government and the individual. I find that the agency acted with reckless disregard for the rights of the Plaintiffs under the Right to Financial Privacy Act. The record is replete with instances in which SEC staff members indiscriminately "cut and pasted" together broad requests for the Plaintiffs' financial records without even questioning the efficacy of those requests under the RFPA. The record also reveals instances in which the staff members sought the advice of their superiors with respect to RFPA matters and either never received the necessary guidance to comply with the Act or ignored what little guidance they were given. This complete lack of coordination by the agency over RFPA matters is difficult to comprehend, given that the agency had a grace period of two years in which to prepare for the application of the RFPA to its requests for financial information. The issuance of the update letters without any notice to the Plaintiffs is simply beyond rational explanation. The excisions of the subpoena sent with the customer notices are likewise difficult to comprehend. I have noted above the dangers inherent in an initial improper determination by the agency that the RFPA does not apply to a particular request for financial information.

III. CONCLUSIONS OF LAW

■ In reaching my conclusions as to the merits of Plaintiffs' application for a preliminary injunction I am guided by the four factors which I set out above:

1. a substantial likelihood that the Plaintiffs will prevail on the merits;

2. a showing that the movant will suffer irreparable harm unless the injunction issues;

3. proof that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and

4. a showing that the injunction, if granted, would not be adverse to the public interest.

■ As to the first factor, Plaintiffs have sufficiently demonstrated that they have a substantial likelihood of prevailing in this action at a trial on the merits. The violations of the RFPA which I have found above are clear and convincing. In particular, the issuance of the "update letters" is perhaps the grossest violation of the Act which is possible. It is important to note that Plaintiffs need only demonstrate a substantial likelihood of success on the merits with respect to section 3418, as opposed to 3417, of the Act. I have considered, and rejected, the SEC's contention that in the absence of actual unlawful access to a customer's banking records, there is no remedy available under the Act. I refuse to put the cart before the horse and require irreparable injury as a prerequisite to injunctive relief. Where a government authority has acted with reckless disregard for the rights of the Plaintiff under the RFPA, as I have so found, and the failures to comply with the procedures of the Act are not merely "technical" defects, injunctive relief is warranted. In sum, I am convinced that Plaintiffs have carried their burden with respect to the first factor.

As to the second factor which Plaintiffs must prove, that they will suffer irreparable harm if the injunction is not granted, there are two distinct subissues before the Court. First, absent the entry of a preliminary injunction enjoining future violations of the Act, is there a reasonable probability that future violations will occur? The SEC maintains that it has taken the remedial measures recounted above and has eliminated the possibility of any future violations of the Plaintiffs' rights under the act. Thus, there is no necessity for the entry of an injunction since the agency itself has abated the possibility of any future violations. Although I do not mean to belittle the

SEC's honest attempts to curb the abuses which are currently before the Court, to argue now that these remedial measures will vacate the necessity for an injunction smacks of "protestations of repentance and reform" in anticipation of litigation. *See United States v. Oregon Medical Society,* 343 U.S. 326, 333, 72 S.Ct. 690, 695, 96 L.Ed. 978 (1951). The SEC has only begrudgingly admitted in the course of this litigation that the excised subpoenas in the customer notices and the update letters were not in compliance with the Act. In response to Plaintiffs' requests for admissions, for instance, the SEC took the position early on that the subpoenas and customer notices were in substantial compliance with the Act, and that no notice was required with respect to the update letters. Ken Lay and Gail Vance have since admitted, however, that none of the requests for financial information should have been issued. Nevertheless, the SEC still steadfastly contends that, since the SEC was unable to receive any of the information and records sought under the defective requests, no violations of the Act have occurred. I find that there is a reasonable probability that there will be future violations of the RFPA with respect to the SEC's investigations of Plaintiffs. I base this conclusion upon the factors I have noted above as well as the fact that the record in this case establishes gross violations of the Act. Further, I have found that the SEC has acted with reckless disregard to Plaintiffs' rights under the statute.

The second distinct subissue with respect to the irreparable harm factor is the extent to which Plaintiffs would be harmed if no injunction were to issue and future violations were to occur. The Court need not look any further than the update letters. With the update letters, the SEC attempted to entirely skirt the procedures and limitations set forth in the act. But for the diligence of Plaintiffs' counsel in ascertaining the existence of those requests, Plaintiffs' financial records could have been released to the agency and Plaintiffs' rights under the Act irretrievably lost. The same is true of the materials called for by the excised portions of the Republic, Citibank

and First in Dallas subpoenas. Further, Plaintiffs have received no assurances from the SEC that the materials obtained by the SEC in the course of the investigation will be kept confidential. In fact, the form list of standard uses of such materials which the SEC has sent Plaintiffs in response to their requests for confidentiality expressly acknowledge that the agency may use the information to coordinate other law enforcement activities and respond to the inquiries of the press and public which relate to specific matters which the SEC is investigating. Under these circumstances I am of the opinion that Plaintiffs have made the requisite showing of irreparable harm which will occur absent the entry of a preliminary injunction enjoining the agency from violating Plaintiffs' rights under the Act.

The third factor requires the Court to balance the relative harms which would result from a grant or denial of injunctive relief. The entry of a preliminary injunction which enjoins the SEC from violating Plaintiffs' rights under the RFPA could not possibly result in any harm to the Defendant agency. Such an injunction would merely require the agency to do that which the law already requires of it. On the other hand, if the injunction were denied, I have found that there is a reasonable possibility that Plaintiffs' rights under the Act may be violated, or even irretrievably lost. As to this factor then, it is no contest—Plaintiffs have carried their burden.

The final factor which the Court must consider is the effect that an injunction might have upon the public interest. The public interest is often declared in the form of a statute and it has been held that when the acts which are sought to be enjoined have been declared unlawful or are clearly against the public interest, a Plaintiff need not show irreparable injury or a balance of hardships in his favor. Wright & Miller, Federal Practice and Procedure § 2948 at 460–61 and *cases cited therein.* In the instant case the Court need not look any further than section 3418 of the Right to Financial Privacy Act. There, Congress

has expressly given federal courts the power to grant injunctive relief in order to assure that the provisions of the Act are complied with by government authorities.

I have concluded above that Plaintiffs have carried their burden with respect to the four factors enumerated above. In addition, I note that if the Court were not to grant a preliminary injunction in the instant case, there would remain the distinct possibility that Plaintiffs' rights under the RFPA could be violated by the SEC, and possibly irretrievably lost. Under these circumstances, I am compelled to conclude that an injunction must enter restraining and enjoining the SEC from violating Plaintiffs' rights under the Right to Financial Privacy Act, and in particular the issuance of excised customer notices and "update letters." Concurrent with the entry of the injunction I will lift the stay of discovery imposed upon the SEC with respect to the continuance of its investigation. Therefore, it is ORDERED as follows:

1. The stay of discovery in effect as to the Defendant Securities and Exchange Commission with respect to the continuance of its investigation in matter HO–1233 is hereby vacated;

2. The temporary restraining order in effect as to the Defendant Securities and Exchange Commission enjoining the violation of Plaintiffs' rights under the Right to Financial Privacy Act, and in particular, the issuance of "update letters" is hereby dissolved; and

3. Plaintiffs' motion for a preliminary injunction is GRANTED; the Defendant Securities and Exchange Commission is hereby enjoined and restrained from violating Plaintiffs' rights under the Right to Financial Privacy Act, and in particular the issuance of update letters or customer notices with excised subpoena attachments. This preliminary injunction is conditioned upon, and shall become effective upon, the posting by Plaintiffs of security for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained. The Court hereby ORDERS that security be posted in the amount of One Thousand and No/100 Dollars ($1,000.00).

To any extent that any conclusion of law shall be construed or interpreted to be, or contain, a finding of fact, such conclusion shall be treated as and considered by this Court to be a finding of fact.