**Leroy A. PESCH, M.D., Plaintiff,**

v.

**FIRST CITY BANK OF DALLAS, Republic Health Corporation, and Credit des Bergues, Defendants.**

**Civ. A. No. CA3–86–1371–D.**

United States District Court,
N.D. Texas,
Dallas Division.

June 27, 1986.

See also 637 F.Supp. 1530.

Tom Bayko and James A. Jones, of Holtzman & Urquhart, Houston, Tex., and Michael W. Ford and Jonathan R. Nelson, of Chapman & Cutler, Chicago, Ill., for plaintiff.

Stephen S. Maris, of Passman & Jones, Dallas, Tex., for First City Bank of Dallas.

Stephen Cormac Carlin, of Johnson & Swanson, Dallas, Tex., for Republic Health Corp.

Alan W. Harris, of Andrews & Kurth, Dallas, Tex., and Donald F. Luke, of Rogers & Wells, New York City, for defendant Credit des Bergues.

## MEMORANDUM OPINION AND ORDER

FITZWATER, District Judge.

Leroy A. Pesch, M.D. ("Pesch"), plaintiff, applies for a preliminary injunction to prevent the transfer of 210,000 shares of stock of Republic Health Corporation ("Republic") to defendant, Credit des Bergues ("CDB"). The application is before the court on memoranda and Fed.R.Civ.P. 43(e) affidavits. The court assumes, without deciding, that Pesch has demonstrated all the requisite elements of *Canal Authority of State of Florida v. Callaway*, 489 F.2d 567, 572 (5th Cir.1974), for obtaining a preliminary injunction except the requirement that he will suffer irreparable harm if the court does not issue the injunction.[1] The court concludes that Pesch has failed to satisfy the irreparable harm requirement and denies the application for the reasons that follow.[2]

### I.

So much of the background facts as are necessary to place the court's decision in context are recounted throughout the court's opinion.[3] Because the court concludes that Pesch has failed to demonstrate irreparable injury, even if he has met the other *Canal* requirements, the court accepts as true, for purposes of deciding the preliminary injunction application, Pesch's version of the merits of his claim.

### II.

Pesch's position on the necessity and basis for proving irreparable harm has varied throughout the short life of this litigation. In his state court petition, Pesch alleges:

If Republic and [First City] are permitted to re-register the option shares in CDB's name and transfer the option shares to CDB, a judgment in the instant proceedings in Pesch's favor would be rendered ineffectual. If CDB takes possession of the option shares, it can be reasonably anticipated that the stock certificates representing the option shares will be removed from the United States. If these stock certificates are removed from the United States as anticipated, Pesch will be forced to initiate new legal proceedings against CDB in the courts of a foreign state. (Pesch State Pet. at 4, ¶ 20).

In his initial memorandum of law in support of his application for a preliminary

---

1. The other *Canal* elements are: (1) a substantial likelihood of success on the merits; (2) that the threatened injury to the movant outweighs the damage the injunction might cause to the opponent; and (3) that the injunction will not disserve the public interest.

2. Pursuant to Fed.R.Civ.P. 52(a), the court issues this memorandum opinion as its findings of fact and conclusions of law.

3. *See also* this court's memorandum opinion and order denying Pesch's motion to remand to state court, 637 F.Supp. 1530 (1986). The other party, First City Bank of Dallas ("First City"), is the transfer agent for Republic's stock.

injunction, Pesch argues that he has a statutory right to a preliminary injunction and therefore need not show irreparable injury. In his reply memorandum he argues that he will suffer irreparable injury and urges, alternatively, that he has a statutory right that precludes the necessity for showing irreparable injury.

### Must Pesch Demonstrate Irreparable Harm?

■ In his initial memorandum Pesch contends his suit to restrain Republic from transferring the shares is a remedy within the scope of TEX.BUS. & COMM.CODE ANN. § 8.315(c) (Vernon Supp.1986). He argues that, because this section provides that the right to reclaim possession of a security "may be specifically enforced and the transfer of a certificated or uncertificated security enjoined," he has a statutory right to an injunction and need not demonstrate irreparable harm. In support of this argument he relies upon *South Central Bell Telephone Co. v. Louisiana Public Service Commission,* 744 F.2d 1107 (5th Cir.1984), *vacated and remanded on other grounds,* —— U.S. ——, 106 S.Ct. 2884, 90 L.Ed.2d 972 (1986), and *Environmental Defense Fund, Inc. v. Lamphier,* 714 F.2d 331 (4th Cir.1983).

*South Central Bell* and *Lamphier* do not guide the court's application of § 8.315(c). In *South Central Bell* the Fifth Circuit reviewed a district court preliminary injunction issued pursuant to 47 U.S.C. § 401(b), a provision of the Communications Act of 1934. South Central Bell Telephone Company had filed tariff revisions with the Louisiana Public Service Commission seeking an increase in intrastate rates. The Louisiana Commission denied Bell's rate increase but in doing so "implied its refusal" to implement Federal Communications Commission depreciation methods. Bell filed suit in district court seeking, *inter alia,* a preliminary injunction. The court issued a preliminary injunction and the Louisiana Commission undertook certain actions that Bell contended were contrary to law. Consequently, Bell sought in district court a modified prelimi-

nary injunction or an order holding the Louisiana Commission in contempt. The district court issued a modified preliminary injunction from which the Louisiana Commission appealed. One of the grounds of appeal was that the district court had not required Bell to demonstrate irreparable harm. The Fifth Circuit rejected the argument on the ground that the usual prerequisite of irreparable injury need not be established where an injunction is expressly authorized by statute and the statutory conditions are satisfied. 744 F.2d at 1120.

Section 401(b), the statute involved in *South Central Bell,* is unlike TEX.BUS. & COMM.CODE ANN. § 8.315(c). Section 401(b) expressly provides:

If any person fails or neglects to obey any order of the Commission other than for the payment of money, while the same is in effect, the Commission or any party injured thereby, or the United States, by its Attorney General, may apply to the appropriate district court of the United States for the enforcement of such order. If, after hearing, that court determines that the order was regularly made and duly served, and that the person is in disobedience of the same, *the court shall enforce obedience to such order by a writ of injunction* or other proper process, mandatory or otherwise, to restrain such person or the officers, agents, or representatives of such person, from further disobedience of such order, or to enjoin upon it or them obedience to the same. (Emphasis added).

By contrast, § 8.315(c) merely makes available to an applicant relief by way of injunction:

The right to obtain or reclaim possession of a certificated security or to compel the origination of a transfer instruction may be specifically enforced and the transfer of a certificated or uncertificated security enjoined and a certificated security impounded pending the litigation.

*Lamphier,* the other case cited by Pesch, is also distinguishable. In *Lamphier,* the Fourth Circuit upheld a permanent injunction issued to require compliance with haz-

ardous waste regulations. The statutes in *Lamphier* were, *inter alia*, the Resource Conservation and Recovery Act of 1976, 42 U.S.C. §§ 6901 *et seq.*, and various Virginia waste disposal laws, Va.Code §§ 32.1–177 *et seq.* Plaintiffs were two private environmental groups. The Commonwealth of Virginia intervened as a plaintiff. The Fourth Circuit noted that where the plaintiff is a government entity or are private attorneys general, as opposed to private individuals, the law of injunction differs, 714 F.2d at 337, and that in cases of public health legislation the emphasis shifts from irreparable injury to concern for the general public interest, *id.* at 338. Pesch correctly argues that the court held that where a statute authorizes injunctive relief for its enforcement plaintiffs need not plead and prove irreparable harm. *Id.* However, the court's holding was in the context of 42 U.S.C. § 6928, which the Fourth Circuit construed to call explicitly for the judicial issuance of injunctions to coerce compliance with the requirements of the Resource Conservation and Recovery Act.

In his reply memorandum, Pesch cites three additional cases: *McDonnell v. Campbell-Taggart Associated Bakeries, Inc.,* 376 S.W.2d 915 (Tex.Civ.App.1964, no writ), *Hunt v. U.S. Securities & Exchange Commission,* 520 F.Supp. 580 (N.D.Tex. 1981), and *Murry v. American Standard, Inc.,* 488 F.2d 529 (5th Cir.1973). Pesch's reliance upon these cases is likewise misplaced.

In *Hunt*, Judge Porter was considering the "public interest" element of the Fifth Circuit preliminary injunction test when he stated the proposition for which Pesch cites *Hunt*:

> The final factor which the Court must consider is the effect that an injunction might have upon the public interest. The public interest is often declared in the form of a statute and it has been held that when the acts which are sought to be enjoined have been declared unlawful or are clearly against the public interest,

a Plaintiff need not show irreparable injury or a balance of hardships in his favor.

520 F.Supp. at 609. Earlier in his opinion, Judge Porter expressly found that plaintiffs had proved irreparable injury. *Id.* at 608–609.

In *Murry*, the district court issued a preliminary injunction that required that a terminated employee of a company be reinstated. The injunction was authorized by 42 U.S.C. § 2000e–5(g) for a violation of Title VII of the Civil Rights Act of 1964. The court held that irreparable harm should be presumed from the very fact that the statute has been violated. 488 F.2d at 531. Unlike *Murry*, in the instant case there is no statute that CDB is alleged to have violated that will serve as a statutory predicate for issuance of a preliminary injunction.

■ *McDonnell* is a decision of the Texas court of civil appeals. Although the instant case is a diversity action removed from state court, under *Erie*[4] principles this court is not bound by Texas law in determining whether a party has satisfied a federal procedural standard. *See Randall v. Arabian American Oil Co.,* 778 F.2d 1146, 1152 (5th Cir.1985) (in diversity case a federal court follows federal procedure), and *System Operations, Inc. v. Scientific Games Development Corp.,* 555 F.2d 1131, 1141 (3d Cir.1977) (Fed.R.Civ.P. 65(a) contemplates a federal standard as governing requests addressed to the federal courts for preliminary injunctions). Accordingly, to the extent *McDonnell* supports Pesch's position, the court declines to follow *McDonnell* and instead follows federal law.

The court concludes that Pesch has not demonstrated that § 8.315(c) is a statutory basis for excusing plaintiff from showing irreparable harm.

### *Has Pesch Demonstrated Irreparable Harm?*

In his state court petition, and in his reply memorandum, Pesch attempts to

---

**4.** *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58    S.Ct. 817, 82 L.Ed. 1188 (1938).

show that he will be irreparably harmed if a preliminary injunction does not issue. In the state petition Pesch alleges (1) a judgment in his favor would be rendered ineffectual and (2) CDB will remove the stock from the United States and Pesch will be forced to initiate new legal proceedings against CDB in the courts of a foreign state. In his reply memorandum, Pesch reiterates his contention that CDB lacks the capacity to respond in damages and adds these grounds: (3) Pesch will lose the power to vote the 210,000 shares in a leveraged buy-out of Republic and otherwise; (4) it is difficult to establish precisely the impairment of Pesch's investment gains if the buy-out attempt fails; (5) the loss of voting rights accompanying the stock is not susceptible to monetary evaluation; and (6) the stock shares are items of personal property that have unique value to an entrepreneur like Pesch who invests for the purpose of acquiring control. Each of these contentions fails upon closer scrutiny.

### A. Damages

■ Pesch's contentions in his state petition and in his reply memorandum that CDB cannot respond in damages in the various amounts alleged by Pesch are not supported by the evidence. In his rebuttal declaration, Pesch avers that "[b]ased upon financial information described in my prior declaration, it is my belief that CDB is not in a position to be able to indemnify me for an injury of the magnitude that I will suffer if the buy-out fails." (Pesch Rebuttal Decl. at 10, ¶ 22). The court has carefully reviewed Pesch's prior declaration. The only portions to which Pesch could reasonably be referring are ¶¶ 16 and 35.

In ¶ 16 Pesch states his "understanding" regarding the percentage of the total CDB credit portfolio represented by his borrowings. (Pesch Decl. at 5, ¶ 16). Alone, this "understanding," even if it had been based upon personal knowledge, does not demonstrate that CDB cannot respond in damages. In ¶ 35 Pesch states that "CDB's failure to honor its commitments to finance the Charmettes and Genolier transactions convinced me that CDB was not an institution of sufficient strength or flexibility to meet the financing needs of PHS." (Pesch Decl. at 13, ¶ 35). Pesch's unilateral conviction, without more, that CDB's actions with respect to the clinic acquisitions indicated a lack of sufficient financial strength, likewise does not demonstrate that CDB cannot respond in damages. The court can find no other references that would support such a contention.

Indeed, CDB has already demonstrated its ability and willingness to transfer over $3 million from Switzerland to New York City and has, during its lending relationship with Pesch, made substantial loans to him. In or about March 1984, Pesch had borrowings of 10 million Swiss francs (approximately $5 million) outstanding on his personal line of credit. (*Id.*).

### B. Foreign Litigation

■ Pesch urges as another ground for injunctive relief that he will be compelled to litigate in the courts of a foreign state. He has not, however, made the showing required in this circuit that resort to the Swiss courts would be futile. *See Enterprise International, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 473 (5th Cir.1985). When it is shown that foreign courts provide a legal remedy or, at worst, that access to foreign courts is speculative, injunctive relief has been refused. *Id.*

In the instant case Pesch has submitted affidavits from a Swiss attorney, Olivier Bourgeois, on matters of Swiss law. Mr. Bourgeois' discussion of various provisions of Swiss law, although offered by Pesch to support the merits of his claim, has the incidental effect of demonstrating that the Swiss courts constitute a reasonable forum for resolving this dispute and that resort to them would not be futile.

### C. Voting the Shares in the Leveraged Buy-Out

■ It becomes apparent to the court once the court reaches Pesch's reply brief

that his motivation for attempting to preclude CDB from obtaining the 210,000 shares in question, and indeed perhaps the animus for this lawsuit, is Pesch's fear that CDB's ownership of the shares will somehow affect the planned leveraged buy-out of Republic and, in turn, deprive Pesch of potential profits of $117.5 million on an investment of $2.5 million.[5] No matter how real his fear, Pesch has failed to transform it to irreparable harm in his evidence submissions.

Reduced to its simplest terms, Pesch's argument goes like this: Pesch is a director of Republic and a participant in a planned leverage buy-out of Republic. Including the 210,000 shares, Pesch owns $41 million of stock at $19.25 per share. (The 210,000 shares in issue, according to CDB, represent about 1% of the stock). As an insider, he cannot vote the stock on the issue of whether the disinterested, non-insider holders of Republic stock favor the leveraged buy-out. (Pesch Reply Mem. at 8). If CDB gains control of the stock,[6] CDB may vote on this issue as an outsider and Pesch has no assurance that CDB will not, from whatever motives, vote against the transaction. *Id.* It is *unknown* how the remainder of the "outsider" stock will be voted. Pesch has spent approximately $2.5 million "to put together the transaction" and will immediately lose that amount plus $17.5 million *if* the transaction fails. Pesch will also suffer future damages from investment gains resulting from the buy-out in the magnitude of $100 million within five years. *Id.* at 8–9.[7] *If* CDB gains the

stock and votes against the buy-out *and* the transaction fails by a margin of 210,000 share votes or less, CDB's actions will irreparably injure Pesch. *Id.*[8] It is entirely *possible* that CDB will choose to vote against the buy-out and *possibly* frustrate Pesch's buy-out plan. (Pesch Reply Mem. at 22). The leveraged buy-out agreement has supermajority terms. The buy-out must thus receive the approval of a majority of the non-interested stockholders. (Pesch Rebuttal Decl. at 9, ¶ 18). Pesch concedes that he *does not know* how the non-interested insiders will vote, but *speculates* that if CDB were transferred the shares the buy-out could fail. *Id.*

It is apparent to the court that Pesch's argument relies for success on assumptive leaps that are not supported by the record. First, Pesch's contentions are replete with terms like "if" and "possible," that is, they constitute unsupported speculation. Second, Pesch's own reasoning is inconsistent with the notion that CDB would not vote its shares in support of the buy-out. According to Pesch, CDB can realize a profit of $1 million by purchasing the shares at the option price of $14.40 per share and selling at the leveraged buy-out price of $19.25 per share. (*See* Pesch Rebuttal Decl. at 8, ¶ 16). Moreover, Pesch avers that CDB will *lose* money if the leveraged buy-out does not succeed. *Id.* According to Pesch, if the buy-out fails, "it can be reasonably anticipated that the value of shares in [Republic] will drop to $11.00 per share," (*Id.* at 9–10, ¶ 19).[9] Pesch does not

**5.** These specific allegations of money damages and the precise arguments regarding potential investment and profit losses reflected in Pesch's papers belie his contentions that it is difficult to establish his impairment if the buy-out attempt fails and that the loss of voting rights accompanying the stock is not susceptible to a monetary evaluation. Accordingly, the court does not discuss these contentions further.

**6.** One problem the court encounters in weighing the equities presented in this case and in accepting that Pesch is irreparably harmed by this circumstance is that Pesch would be in the same position had CDB paid $3,024,000 to Pesch and had there, in turn, been no litigation. That is, Pesch would still be out 210,000 shares of Re-

public stock and could suffer all the consequences he now speculates could occur.

**7.** These are further examples of Pesch's ability to quantify his losses in damages. *See* note 5, *supra.*

**8.** Pesch concludes, however, that due to certain restrictions on the shares pursuant to the Securities Act of 1933 "CDB could not sell the stock on the open market prior to the buy-out." (Pesch Reply Mem. at 10).

**9.** This is another example of Pesch's ability to calculate his losses in damages. *See* notes 5 and 7, *supra.*

explain why CDB would act in a manner that would cause it to lose $714,000 when it could make a $1 million profit. Third, Pesch does not provide the court with sufficient evidence to ascertain whether the speculated chain of events could have a bearing on the buy-out plan. Nowhere is the court told what percentage of the non-insider shares would be represented by the 210,000 shares at issue here if they went from insider to non-insider status. Pesch does not explain the basis for contending that the buy-out vote could fail by 210,000 votes.[10] If Pesch desires a preliminary injunction predicated upon such a showing of irreparable harm, he must demonstrate the facts necessary to sustain such a showing, which he has not done.

### D. Shares as Having Unique Value

Pesch contends the 210,000 shares in issue have unique characteristics that entitle him to entry of an injunction. However, there is no basis for the court's concluding from the evidence that Pesch will lose any degree of control or for concluding that 210,000 shares will bear at all upon his degree of control of Republic.

Pesch cites various Texas and other state decisions for the proposition that equity will enjoin the transfer of stock shares because the loss of stock shares represents irreparable injury to a stockholder. In *Spencer v. James*, 10 Tex.Civ.App. 327, 31 S.W. 540, 542 (1895, no writ), the court of civil appeals held that money damages would not be an adequate remedy at law since the owner of the stock might prefer the property itself to its equivalent in money. In *McDonnell*, the court of civil appeals likewise held that a remedy at law is not adequate for a person who wants to keep his stock rather than to sell it at the market price. 376 S.W.2d at 920. If this court is bound to look to Texas law regard-

ing the standards for issuing a preliminary injunction,[11] *Spencer* and *McDonnell* do not prove helpful.

*Spencer*, decided by the court of civil appeals in 1895 and not since cited for the proposition in question here, involved an appeal from a final judgment after a trial. 31 S.W. at 542. The injunction issued was permanent, not preliminary. The court's discussion of an adequate remedy appears to arise in the context of the plaintiff's choice of remedy upon entry of a final judgment.

*McDonnell* did involve a temporary injunction but the court's holding represented its view, in *dictum*, that a remedy of damages "is not adequate for a person who wants to keep his stock rather than to sell it at the market price." 376 S.W.2d at 920. *McDonnell* has not been cited by another Texas court for this proposition.

Moreover, neither *Spencer* nor *McDonnell* provides enough facts concerning the stock in question for this court to conclude it is *Erie*-bound to follow them. Without guidance regarding whether substantial injury could have been incurred by the loss of the stock in question or whether the stock was unique, *Spencer* and *McDonnell* appear to carve out an exception to normal principles of equity, in the case of stock shares, on the unprincipled ground that a share owner, for totally subjective and unassigned reasons, may want to keep his stock. Neither case analyzes the reasons the shareholder had for keeping the stock (*e.g.*, for corporate control or to exercise voting rights). Neither case explains why such a rule should apply, for example, in a suit to enjoin the transfer of 1,000 shares of a widely-traded, publicly-held corporation with one million outstanding shares. In such a case the price of the shares could be easily ascertained and damages could be awarded. The loss of 1,000 shares could

---

**10.** Likewise, if Pesch's concern is only that he will yield 210,000 shares to a non-insider, he does not demonstrate why he cannot now purchase 210,000 other shares from one or more non-insiders.

**11.** *Cf. System Operations*, 555 F.2d at 1141 (although right upon which cause is based is state-created, Fed.R.Civ.P. 65(a) contemplates a federal standard as governing requests addressed to federal courts for preliminary injunctions), *accord, Continental Group, Inc. v. Amoco Chemicals Corp.*, 614 F.2d 351, 357 n. 10 (3d Cir.1980).

not materially affect the conducting of corporate affairs.

■ This court is not prepared to hold, on the authority of these cases,[12] that a shareholder's subjective, unexplained desire to keep his shares constitutes irreparable injury in each and every case. Nor, for the reasons set forth above, is the court prepared to hold that Pesch has demonstrated a sufficient basis for subjectively desiring to keep the shares in the instant case.

### III.

The application for a preliminary injunction is denied. The temporary restraining order issued by the 298th District Court and continued by this court shall continue in effect until Tuesday, July 1, 1986, at 5:00 p.m., in order that the parties to this international dispute may have ample time to review the court's decision. The temporary restraining order shall terminate at 5:00 p.m., July 1, 1986.

SO ORDERED.

---

**12.** The court does not address the non-Texas state cases cited by Pesch. The court is clearly not *Erie*-bound to follow them.