**BEZTAK COMPANY, et al., Plaintiffs,**

v.

**BANK ONE COLUMBUS,
N.A., Defendant.**

**No. 92–75152.**

United States District Court,
E.D. Michigan, S.D.

Dec. 21, 1992.

James J. Vlasic, Southfield, MI, for plaintiffs.

Richard A. Rossman, Detroit, MI, for defendant.

## OPINION AND ORDER PARTIALLY GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

### Introduction

EDMUNDS, District Judge.

Plaintiffs Beztak Company, Jerry Luptak, and four trust entities[1] have brought

---

1. Plaintiffs include the Beztak Company, a partnership, whose partners are Jerry Luptak, Nina Luptak, and Beznos Realty Investment Co. Beznos Realty is owned by Harold Beznos, Norman Beznos, and Maurice Jerry Beznos. The trust entities that are named plaintiffs in this action include the following:
1. Paola M. Luptak Irrevocable Trust, Gordon B. Hall, Jr., trustee;
2. Harold Beznos Children's Trust f/b/o Leslie Beznos, Jay A. Fishman, trustee;

this action seeking preliminary and permanent injunctive relief. The matter arises out of transactions between plaintiffs and others and Bank One, in which Security Bancorp stock was pledged to secure certain loans. The Bank has seized the stock and plans to sell it, claiming that it is entitled to do so as a result of plaintiffs' defaults on their loans. Plaintiffs' complaint and separate motion for preliminary injunction allege that the seizure and sale are improper and should be enjoined. Plaintiffs also seek an affirmative order requiring Bank One to release the stock upon the repayment of four loans for which the stock is admittedly pledged as security. For the reasons stated herein, plaintiffs' motion for preliminary injunction is hereby granted in part, and the Bank's seizure and proposed sale of the stock is preliminarily enjoined.

## I. *Facts*

Jerry Luptak and Harold Beznos are longtime business associates, real estate developers, and investors. Luptak first started investing in Security Bancorp in 1968, and at one time owned between 7.5% and 8% of the stock. Over the years, stock was acquired by Luptak personally, by his wife Nina Luptak, by Harold Beznos, and by a number of different family trust entities. In the early 1970's, Luptak and Beznos formed a company called Beztak, through which they conducted much of their development and investment business. Beztak has had long financial relationships with several different banks, including National Bank of Detroit, Manufacturers National Bank, and Defendant Bank One.

In May of 1990, some of the Security Bancorp stock was held by Shearson Lehman, which had advanced the funds for the stock purchase. The parties were interested in refinancing the purchase of the stock at better margin, and for that purpose entered into two stock loans with Bank One: the Luptak Stock Loan for $4.4 million and the Beznos Stock Loan for $960,000.

Security Bancorp stock was pledged in May 1990 as security for the two stock loans. Pursuant to the May 1990 Security Agreements, Jerry and Nina Luptak and the Paola Luptak Irrevocable Trust pledged stock to secure the Luptak Stock Loan, and the Samuel, Leslie, and Lauren Beznos Irrevocable Children's Trusts pledged stock to secure the Beznos Stock Loan.

The May 1990 Security Agreements contained dragnet clauses [2] providing that the Plaintiffs pledged stock in Security Bancorp as collateral for all indebtedness "now existing or hereafter arising." [3] The May 1990 Security Agreements also contained future advance clauses, granting the stock as security for all future obligations to Bank One.[4] According to the testimony of

---

3. Harold Beznos Children's Trust f/b/o Samuel Beznos, Jay A. Fishman, trustee; and 4. Maurice Jerry Beznos Children's Trust f/b/o Lauren Beznos, Michael J. Mehr, trustee.

**2.** Bank One objects to the term "dragnet clause," arguing that a dragnet clause is language that extends collateral to future advances. However, the legal definition of a dragnet clause is a "[p]rovision in a mortgage in which mortgagor gives security for past and future advances as well as present indebtedness." *Black's Law Dictionary* 494 (6th ed. 1990). Thus, the provision of the May 1990 Security Agreements that provides that the stock secures past, present, and future indebtedness may properly be termed a dragnet clause.

**3.** The May 1990 Security Agreements provided:
The security interest hereby granted is to secure the prompt and full payment and complete performance of all Obligations of Debtor to Bank. The word "Obligations" is used in its most comprehensive sense and includes, without limitation, all indebtedness . . . . *whether now existing or hereafter arising,* either created by Debtor alone or together with another or others, primary or secondary, secured or unsecured, absolute or contingent, liquidated or unliquidated, direct or indirect, whether evidenced by note, draft, application for letter of credit or otherwise, and any and all renewals of or substitutes therefor. The word "Obligations" shall include, BUT NOT BE LIMITED TO, all indebtedness owed by Debtor to Bank by reason of [the $4.4 million Stock Loan or $960,000 Stock Loan as applicable].
May 1990 Security Agreements, pp. 1–2 (emphasis added).

**4.** The future advance clause provided:
It is Debtor's express intention that this agreement and *the continuing security interest granted hereby, in addition to covering all present Obligations of Debtor to Bank, shall extend to all future Obligations of Debtor to Bank,* whether or

Harold Beznos, there was no discussion in May of 1990 regarding whether or not the stock would secure any loan other than the specified Luptak and Beznos Stock Loans. Further, the dragnet clause was not negotiated. Bank One did not contradict this testimony.

Later in 1990, Beztak sought financing from Bank One for the Muirwood Apartments real estate development. The bank was willing to advance $6 million for the Muirwood project secured by a third mortgage on the Muirwood Apartments, but it insisted that Plaintiffs also provide collateral for the two existing lines of credit ($2.5 million and $5 million), which until that time had been unsecured. As a result of extensive negotiations, in February of 1991 the parties finalized a "Cross Collateralization Agreement," and the Luptak and Beznos families and related entities (the "Luptak Beznos Group") provided various collateral on the Lines of Credit, including the Security Bancorp stock which had been pledged on the Luptak and Beznos Stock loans.

Through new security agreements dated February 1991, the stockholders pledged the stock to secure the Lines of Credit as follows: the Jerry Luptak Revocable Trust[5] pledged stock to secure both the $2.5 and the $5 million Line of Credit; the Samuel, Leslie, and Lauren Beznos Irrevocable Trusts as well as the Paola Luptak Irrevocable Trust pledged stock to secure the $2.5 million Line of Credit.

Unlike the May 1990 Security Agreements, those signed in February 1991 limited the definition of "Obligations" secured by the pledge of the stock, stating:

> not such Obligations are reduced or entirely extinguished and thereafter increased or reincurred, whether or not such Obligations are related to the indebtedness identified above by class, type or kind and whether or not such Obligations are specifically contemplated by Debtor and Bank as of the date hereof. The absence of any reference to this agreement in any documents, instruments, or agreements evidencing or relating to any Obligation secured hereby shall not limit or be construed to limit the scope or applicability of this agreement. May 1990 Security Agreements, p. 2 (emphasis added).

> The security interest hereby granted is to secure the prompt and full payment and complete performance of all Obligations of Debtor to Bank.... The word "Obligations" shall be limited to all indebtedness owed by Debtor to Bank by reason of [the $2.5 or $5 million Line of Credit as applicable].

February 1991 Security Agreements, pp. 1–2.

Beztak attorney Kenneth Clarkson, who had not participated in the May 1990 transaction, testified that the limitation of the stock pledge to the two lines of credit was explicitly negotiated by the parties. Clarkson's testimony is supported by the first draft of the 1991 Security Agreement, which included a dragnet clause like the one in the May 1990 agreement and was rejected by Beztak. The Bank offered no evidence to contradict Clarkson's understanding of the negotiation, nor did it offer anything to counter his testimony that the limitation on the definition of "Obligations" extended to the future advance clause as well.[6]

Clarkson's testimony becomes even more persuasive in the broader business context of the negotiations. In the spring of 1991, Plaintiff Luptak conceived a plan to merge Security Bancorp with First of America. The goal was to maximize shareholder value, and it was critical to Luptak that he own and control a substantial block of shares in order to influence management and the other shareholders. To assure maximum flexibility for the pledged Security Bancorp stock, Luptak insisted on an Agreement for Release of Collateral, which was negotiated contemporaneously with

**5.** In May 1990, Jerry and Nina Luptak pledged 28,917 shares of Security Bancorp stock to secure the Luptak Stock Loan. This was the same stock pledged by Jerry and Nina Luptak, as trustees for the Jerry Luptak Revocable Trust, to secure the $2.5 million and the $5 million Line of Credit in February 1991.

**6.** Although the text of the future advance clause does not unambiguously support Plaintiffs' interpretation, and the drafting shows some inconsistency, Clarkson's testimony was credible and uncontradicted.

the Cross Collateralization Agreement and the second stock pledge. This Agreement, finalized in April, 1991, specified that the pledged stock would be released from securing the $2.5 and $5 million Lines of Credit upon payment of those Lines of Credit, while the stock would continue to secure the Stock Loans for which it had originally been pledged:

> If there are one or more other security agreements between the Bank and any of the Guarantors which secure notes other than the $2.5 Million Note and the $5 Million Note *(for instance, for the Beznos Group and Luptak Group stock loans)*, where the collateral is the same as any of the collateral described herein, a release of that collateral under this Agreement shall not in any way be construed *to be a release of that same collateral under any other security agreement.*

Agreement for Release of Collateral para. 10 (emphasis added).[7]

By the middle of 1991, the Luptak Beznos Group was not able to make the required interest payments on certain of their loans from Bank One. In June of 1991, Beztak Company and Bank One entered into a Credit Agreement[8], whereby Bank One agreed to loan monies to Beztak principally for the payment of interest on certain loans then in default.

In the course of this transaction, Bank One prepared a Schedule listing various outstanding loans together with the guarantors and the security pledged on each of the listed loans. The Schedule listed the Lines of Credit, the Stock Loans, the Roma Ridge Lifestyle Loan, the Royal Crown Lifestyle Loan, and the Muirwood Loan. The schedule that Bank One prepared shows the stock as securing only the two Lines of Credit and the two Stock Loans, and not as securing the Lifestyle Loans or the Muirwood Loan.

Despite the additional advance in mid–1991, Plaintiffs have not been able to meet their financial obligations to Bank One since some time in early 1992. Having been unable to reach agreement on a payment plan which was acceptable for continuing the loans, and having declared nine outstanding loans in default[9] in early August of 1992, Bank One seized the Security Bancorp stock originally pledged by Plaintiffs to secure the Stock Loans and instructed the transfer agent to place the stock, which had been exchanged for First of America stock,[10] in the bank's name. At the time of the seizure, the 176,475 shares

---

**7.** The parties also entered into a letter agreement dated April 18, 1991, regarding conditions to be met to obtain the release of the stock in the event of default on the $2.5 and $5 million Lines of Credit.

**8.** The parties have also referred to this loan as the "Interest Reserve Loan" or the "Collateral Pool Loan."

**9.** Bank One declared the following nine loans in default:
1. $2.5 million Line of Credit, dated February 21, 1988
2. *$5 million Line of Credit, dated March 21, 1988*
3. $4.5 million Royal Crown/Lifestyle Home Loan, dated December 1989
4. $3 million Roma Ridge/Lifestyle Home Loan, dated December 1989
5. $10 million Great Lakes Mushroom, Inc. Loan, dated March 1990
6. $4.4 million Luptak Trust Stock Loan, dated May 16, 1990
7. $960,000 Beznos Trust Stock Loan, dated May 16, 1990
8. $6 million Muirwood Loan, dated October 11, 1990
9. $1,079,000 Credit Agreement Loan, dated June 28, 1991

**10.** Pursuant to a merger, Security Bancorp stock was exchanged for First of America stock as follows:

| Owner | Security Bancorp shares | First of America shares |
|---|---|---|
| Paola Luptak Irrevocable Trust | 32,192 | 42,596 |
| Lauren Beznos Irrevocable Trust | 36,132 | 47,809 |
| Samuel Beznos Irrevocable Trust | 18,066 | 23,904 |
| Leslie Beznos Irrevocable Trust | 18,066 | 23,904 |
| Jerry Luptak Revocable Trust | 28,917 | 38,262 |
| | 133,373 | 176,475 |

of First of America stock were valued at $6,022,209. Bank One has since received over $56,000 in dividends on this stock, which it has applied to delinquent interest and principal on the Stock Loans.

The 176,475 shares of First of America stock seized by Bank One are part of a 2½% voting block owned or controlled by Plaintiffs, constituting the largest individual voting block of stock, larger than all the stock owned by the current management of First of America combined. By letter dated August 31, 1992, Bank One notified Plaintiffs that it intended to sell the stock at one or more private sales after September 11, 1992. When Plaintiffs received notice of the Bank's intent to sell the stock, they filed this action seeking injunctive relief.

## II. *Parties' Allegations*

Although there is no dispute that Jerry and Nina Luptak, the Jerry Luptak Revocable Trust, and the Trusts pledged stock to Bank One, the parties disagree as to which loans the stock secures. Pursuant to the dragnet clause in the May 1990 Security Agreements whereby the stock was originally pledged, Bank One contends that the stock secures all nine of the loans now in default.

Plaintiffs claim that the stock was pledged as security only for the following four loans:

1. $4.4 million Luptak Trust Stock Loan;
2. $960,000 Beznos Trust Stock Loan;
3. $2.5 million Line of Credit; and
4. $5 million Line of Credit.

Plaintiffs argue that it was not the intent of the parties to extend the stock pledge to other loan transactions, prior or subsequent to the original stock pledge. Plaintiffs point to subsequent transactions between the Bank and the Luptak Beznos Group as evidence of the specific intent of the parties to limit the stock pledges to the Stock Loans and the Lines of Credit.

Plaintiffs also allege that Bank One's seizure of the stock has interfered with Plaintiffs' voting rights as shareholders and with Plaintiffs' plan to form a 5% shareholder group to influence First of America management to enhance shareholder value by pursuing merger with a larger institution, a position which Plaintiffs had articulated prior to the seizure. Plaintiffs set forth their business position in a 14B filing with the SEC, filed July 10, 1992.

Plaintiffs also allege that Bank One breached certain agreements by seizing the stock without prior notice to Plaintiffs. Bank One relies on the language of the Security Agreements, which states that the "Bank may, in its discretion, register ownership of any of the collateral in the name of the Bank...." Bank One claims that it was not required to provide any notice.

Plaintiffs have offered to pay the entire principal and interest of the four loans which they claim the stock secured, requesting that the Court preclude Bank One's sale of the stock and that the Court require Bank One to return the stock to Plaintiffs upon Plaintiffs' payment of the four loans.

## III. *Applicable Law*

Ohio law applies to the construction of the stock pledge documents in this case. Paragraph 9 of the May 1990 and February 1991 Security Agreements provides, "This agreement and all rights and obligations hereunder, including matters of construction, validity and performance, shall be governed by the law of the State of Ohio."

## IV. *Standards for Preliminary Injunction*

The availability of injunctive relief is a procedural question that is governed by federal law. *Southern Milk Sales, Inc. v. Martin*, 924 F.2d 98 (6th Cir.1991). The Sixth Circuit has held that a court must consider four factors in deciding whether to issue a preliminary injunction:

1. whether the movant has shown a strong or substantial likelihood of success on the merits;
2. whether the movant has demonstrated irreparable injury;
3. whether the issuance of a preliminary injunction would cause substantial harm to others; and

4. whether the public interest is served by the issuance of an injunction.

*Parker v. U.S. Dept. of Agric.*, 879 F.2d 1362, 1367 (6th Cir.1989). The foregoing factors should balance. *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985).

## V. *Substantial Likelihood of Success on the Merits*

### A. Enforceability of Dragnet Clauses

#### 1. *Parol Evidence and the May 1990 Security Agreements*

When a court is asked to resolve a contract dispute, the underlying inquiry is to determine the intent of the parties. Rules of construction have evolved to assist the court in resolving this question, and the primary disagreement in the instant case is over the application of those rules.

The parol evidence rule prohibits the introduction of evidence of prior or contemporaneous statements to vary or contradict the terms of a written agreement that is complete and unambiguous on its face. *Uebelacker v. Cincom Systems, Inc.*, 48 Ohio App.3d 268, 549 N.E.2d 1210 (1988); *John Deere Indus. Equipment Co. v. Gentile*, 9 Ohio App.3d 251, 459 N.E.2d 611 (1983). In other words, when a written agreement is unambiguous and fully integrated (i.e., it contains the full understanding of the parties), the law does not permit the consideration of parol evidence to determine the parties' intent. If the written document is ambiguous, or if it is not fully integrated, then the court may consider extrinsic or parol evidence. The parol evidence rule does not apply to evidence regarding a subsequent modification of a written agreement nor to the subsequent waiver of contract terms. *Uebelacker*, 549 N.E.2d at 1217.

Lawsuits seeking to enforce dragnet clauses have promoted a wide array of responses from the courts. Observing that such clauses have the potential for abuse by creditors, some courts have taken a broad approach to contract construction, looking to extrinsic evidence as well as contract language. *See, e.g., Marine Nat'l Bank v. Airco, Inc.*, 389 F.Supp. 231 (W.D.Pa.1975) (even though dragnet clause is unambiguous, parol evidence is admissible to determine intent). *But cf. In re Bates*, 35 B.R. 475 (Bkrtcy.M.D.Tenn.1983) (dragnet clause unambiguous, parol evidence not admissible). *See also*, Milton Roberts, Annotation, *Debts Included in Provision of Mortgage Purporting to Cover All Future and Existing Debts (Dragnet Clause)—Modern Status*, 3 A.L.R.4th 690 (1981).

In looking at the contract language itself, most courts have restricted the application of the clause to its narrowest meaning. For example, as to antecedent debts, some courts require that such existing debts be specifically identified. As to subsequent debts, some courts inquire whether the subsequent debt is so related to the original debt that the debtor's consent could be inferred. *Id. See, e.g., John Miller Supply Co., Inc. v. Western State Bank*, 55 Wis.2d 385, 199 N.W.2d 161, 165 (1972) (dragnet clauses are abused when lender relies on broad language of the clause to bring within its terms claims against debtor that are unrelated to course of financing that was contemplated by parties); *Matter of Estate of Simpson*, 403 N.W.2d 791, 793 (Iowa 1987) ("The 'relatedness' rule does not defeat future advances clauses; rather, it helps determine the parties' intent by looking at the relationship between the original security agreement and the later debt").

In *Second National Bank of Warren v. Boyle*, 155 Ohio St. 482, 99 N.E.2d 474, 477 (1951), the Ohio Supreme Court provided a unique interpretation of a dragnet clause. Although it did not specifically discuss the admissibility of parol evidence, the court indicated that it is appropriate to examine the intent of the parties in determining whether a dragnet clause [11] covers a partic-

---

11. Note that Ohio law recognizes the validity of future advance clauses. *See, e.g., In re Scranes,* 67 B.R. 985 (Bkrtcy.N.D.Ohio 1986); Ohio Rev. Code Ann. § 1309.15 (Page 1979) ("Obligations covered by a security agreement may include future advances or other value whether or not the advances or value are given pursuant to

ular subsequent debt. The court construed the future advance clause as an "offer" by the borrower to provide security on future loans, then went on to determine whether the lender expressed an intent to "accept" the offer and therefore form a binding contract of security for a subsequent debt. The court found that the lender did not accept the offer in making the subsequent loan. The bank did not allege that it made the subsequent loan in reliance on the prior grant of security. Also, the court emphasized that the subsequent loan was unrelated to the first loan.

In the instant case, Bank One relies on the dragnet clause in the May 1990 Security Agreements and argues that the stock secures all nine of the loans in default. Bank One contends that the language is clear and unambiguous, and that under the parol evidence rule, evidence regarding outside matters should not be considered.

Plaintiffs argue that the dragnet clause was unnegotiated boilerplate which does not reflect the parties' intent. They contend that the May 1990 agreements were only one part of a comprehensive financing package which must be examined as a whole, and further argue that such examination establishes that the parties intended the stock to secure only the Stock Loans and the Lines of Credit, not all nine loans as claimed by the bank.

■ The parol evidence rule does not bar the introduction of subsequent agreements that may operate as a modification or waiver of the first agreement. Thus, the post 1990 transactions between Bank One and Plaintiffs are relevant to determining the parties' intent with regard to the dragnet clause.[12] The Court must examine the subsequent transactions between the parties to determine their intent with regard to the stock pledges and antecedent and subsequent debts.

The Court agrees that the overall context of Bank One's financing of Plaintiffs' business transactions is relevant and admissible to determine the intent of the 1990 Security Agreement. The dealings between Bank One and Plaintiffs were part of a comprehensive series of loans. Thus, the May 1990 Security Agreements cannot be construed in isolation. Moreover, since the issue of contract construction is governed by Ohio law, which has rejected a strict application of dragnet clauses, the Court will admit and consider extrinsic evidence to clarify the parties' intent.

2. *February 1991 Security Agreements—Stock Pledged to Secure $2.5 and $5 Million Lines of Credit*

■ The dragnet language in the 1991 Security Agreements was specifically negotiated. Mr. Clarkson testified that the parties' intent was to limit the stock pledge only to the Stock Loans and the Lines of Credit. Bank One did not present any evidence contradicting Plaintiffs' allegations of the parties' intent. In fact, counsel for Bank One indicated that Defendant relied entirely on the language of the dragnet clause in the May 1990 Security Agreements and that the parol evidence rule barred the admission of evidence regarding the intent of the parties.

In direct contradiction to its claim in the instant case, however, Bank One's request for security on the Lines of Credit belies its contention that the stock pledged under the May 1990 Security Agreements collateralized antecedent debt. There would have been no need to pledge the stock as security for the Lines of Credit if the parties had intended that the original May 1990 stock pledge secure all "existing" obligations to the bank. Because the Lines of Credit were extended in 1988, they would have constituted existing obligations owed to Bank One, for which the stock would have

commitment.") The issue in this case is not whether or not the dragnet clause is "valid," but whether or not antecedent and subsequent debts were covered by the dragnet clause.

12. Although the security agreements at issue in this case provide that the Bank will not be

deemed to have waived any of its rights except by a written agreement, the parties' course of conduct as specifically discussed in this opinion serves to estop Bank One from denying that it waived or modified its rights under the dragnet clause of the May 1990 Security Agreements.

been pledged in accordance with the dragnet clauses in the May 1990 Security Agreements.

Further, the February 1991 Security Agreements cannot be interpreted as reinforcing the concept that the stock was pledged against subsequent debt. The 1991 Security Agreements on their face were, at best, ambiguous with regard to future advances. The 1991 Agreements define "Obligations" as the existing Lines of Credit, and continue on to state that the security extends to all "future Obligations." However, while it appears that the 1991 Security Agreements were inartfully drafted, it does not appear that the parties intended the stock to secure any debts other than the Stock Loans and the Lines of Credit. This is even more clear upon an examination of other subsequent transactions.

### 3. *April 1991 Agreement for Release of Collateral*

Plaintiff contends that the Agreement for Release of Collateral, executed in April 1991, provides further evidence of the parties' intent that the stock was pledged to secure only the Stock Loans and the Lines of Credit. As noted previously, the Agreement for Release of Collateral provided:

> If there are one or more other security agreements between the Bank and any of the Guarantors which secure notes other than the $2.5 Million Note and the $5 Million Note *(for instance, for the Beznos Group and Luptak Group stock loans)*, where the collateral is the same as any of the collateral described herein, a release of that collateral under this Agreement shall not in any way be construed to be a release of that same collateral under any other security agreement.

Agreement for Release of Collateral para. 10 (emphasis added). Bank One argues that the use of the phrase "for instance" in the above quoted language means "for example," revealing an intent that the stock secured other loans than those identified.

However, Bank One's interpretation seems strained in light of the cumulative evidence that the stock secured only the two Lines of Credit and the two Stock Loans. The phrase "for instance" is more logically interpreted, as Mr. Clarkson testified, to mean "that is." In other words, the Release provided that upon payment of the $2.5 and $5 million Lines of Credit, the stock would be released as to the Lines of Credit, but not as to the Stock Loans that the stock also secured.

### 4. *June 1991 Credit Agreement*

The June 1991 Credit Agreement also supports Plaintiffs' position. Bank One prepared a schedule listing certain loans together with the security pledged on each of the listed loans. Of the nine loans currently in default, the list included the Lines of Credit, the Stock Loans, the Roma Ridge Lifestyle Loan, the Royal Crown Lifestyle Loan, and the Muirwood Loan.

The Lifestyle Loans were closed in 1989, prior to the May 1990 Security Agreements, that is prior to the original stock pledge. The Muirwood loan was closed in the fall of 1990, after the May 1990 Security Agreements. If the parties intended the dragnet clause in the May 1990 Security Agreements to be effective, then the Lifestyle Loans would be "present Obligations" secured by the stock and the Muirwood Loan would be a "future Obligation" secured by the stock. However, the Schedule does not list the stock as security for the Lifestyle Loans or for the Muirwood Loan. The Schedule lists the stock as security only for the Stock Loans and the Lines of Credit.

Under applicable Ohio law, it is appropriate for the Court to examine the intent of the parties. Such an examination reveals substantial evidence that the stock was pledged as security only for the Stock Loans and the Lines of Credit, and was not relied upon or treated as security for other loans between Bank One and the Luptak Beznos Group.

Bank One does not even allege that the parties had a contrary intent or that Bank One relied on the stock in making subsequent loans. In the language of the Ohio Supreme Court, Bank One did not "accept" the pledgers' "offer" of the stock as securi-

ty for future debts. *Second National,* 99 N.E.2d at 477–78. There is no evidence that the parties intended the stock to secure loans other than the Stock Loans and the Lines of Credit. In sum, there is a substantial likelihood that Plaintiffs will succeed on the merits of their claim that the stock secures only four loans, not the nine loans Bank One claims it secures.

### B. Notice of Stock Seizure

■ In addition to their claim that the stock was seized as security for loans for which the stock was not pledged, Plaintiffs also claim that Bank One breached its contract with Plaintiffs by seizing the stock without prior notice. Bank One claims that it was not required to provide any notice, relying on the language of the Security Agreements that states that the "Bank may, in its discretion, register ownership of any of the collateral in the name of the Bank...." Plaintiffs claim that the April 18, 1991, letter agreement regarding the release of the stock requires written notice. However, the letter agreement requires written notice prior to sale of the stock, not prior to seizure. Accordingly, Bank One did not breach its contract with Plaintiffs by seizing the stock without notice.

### VI. *Irreparable Harm*

Plaintiffs claim that the sale of the First of America stock will cause them irreparable harm.[13] They contend that the sale will deprive them of the right to vote the stock, which is critical at this time because of their plan to persuade the Board of Directors of First of America to merge with another bank. They also contend that the sale of the stock will cause irreparable harm to their business reputation. Finally, they allege that the sale of the stock will flood the market, causing the price to drop, and that the sale will result in gains for which they will be liable to pay taxes.

### A. Stock Voting Rights

■ The Luptak Beznos Group articulated their business position with regard to the First of America stock in a Schedule 14B filing with the Securities and Exchange Commission, filed July 10, 1992. Schedule 14B essentially is a notice of intent to solicit proxies. The S.E.C. filing indicated that the Luptak Beznos Group intended to form a 5% shareholder group to influence First of America management to enhance shareholder value by pursuing merger with a larger institution. The 176,-475 shares of First of America stock seized by Bank One are part of a total of 1,222,-128 shares owned by the Luptak Beznos Group. The Luptak Beznos Group stock constitutes 2½% of the total outstanding stock in First of America. This stock is the largest individual voting block in the corporation, a voting block larger than that of all of the current management combined.

Plaintiffs allege that they will suffer irreparable harm upon Bank One's sale of the stock due to the loss of the power to vote the stock and due to the frustration of their plan to form a 5% voting block. Defendants argue that such alleged harm is too speculative to constitute irreparable harm.

Courts have recognized the importance of the corporate electoral process and of the shareholder's right to vote stock. In *Asarco Inc. v. Court,* 611 F.Supp. 468, 480 (D.N.J.1985), the court enjoined the issue of preferred stock because it would dilute the vote of a substantial shareholder who planned to acquire a 20% share. The court found that the issue of the preferred stock

---

**13.** Paragraph 85 of the Complaint alleges that Plaintiffs will be irreparably harmed by the sale of the stock as follows:

(a) Total loss of voting control of such stock by Plaintiffs;

(b) Receipt of unfair and inadequate consideration for the stock compared to its present market value if sold in a commercially reasonable manner;

(c) Adverse tax consequences in the form of taxable gains without cash to discharge the resulting tax liabilities;

(d) Frustration of the business purposes and reputation of Plaintiffs as described in their Schedule 14B filing with the Securities and Exchange Commission with regard to First of America Bank Corporation;

(e) Loss of the market value of stock in excess of the amount of the debt to the Bank which it secures.

would cause irreparable harm to the stockholder. Similarly, in *Packer v. Yampol*, 54 U.S.L.W. 2582, 1986 Westlaw 4748 (Del.Ch. April 18, 1986), the court granted an injunction enjoining supervoting preferred stockholders from voting at a corporate election. The court noted that other shareholders would be harmed because permitting the preferred stock to vote would substantially influence the corporate electoral process and would have a chilling effect on plaintiffs' proxy solicitation.

■ A controlling interest in a corporation is also an important and unique interest. *See, e.g., United Acquisitions Corp. v. Banque Paribas*, 631 F.Supp. 797 (S.D.N.Y.1985). In *United Acquisitions*, the plaintiff alleged that it had a contract to purchase all of the stock of a company from defendants. Plaintiff sued to enjoin the defendants from selling the stock to third parties. The court found that the plaintiff's inability to gain a controlling interest in the sought-after company constituted irreparable harm. *See Davis v. Rondina*, 741 F.Supp. 1115 (S.D.N.Y.1990) (plaintiff sought to enjoin defendant from interfering in her management of a company which she and defendant had established and operated for ten years).

In cases involving the loss of stock voting rights or corporate control, the issue of whether or not a plaintiff may suffer irreparable harm is highly fact specific.[14] Courts have recognized the importance of the right to vote stock, as well as the importance of a stockholder's plan to gain control over a company. In this case, if the Court permits Bank One to sell the stock, Plaintiffs will be deprived of their right to vote the shares. Plaintiffs currently own a

substantial share of First of America stock, and they seek to form a 5% voting block. With a 5% voting block, it is likely that Plaintiffs will obtain a seat on the Board of Directors and will have considerable ability to influence First of America to merge with another institution.

The right to vote the entire 2½% voting block is especially critical at this time. Banks are merging with one another at an increasing rate, and the media reports that First of America is positioned for takeover. As Jerry Luptak testified, the momentum of stock acquisition and the credibility of the ownership block is volatile and sensitive; to lose momentum and credibility at this time would appear to mean to lose the merger opportunity altogether. Further, Plaintiff Jerry Luptak previously has been successful in orchestrating the merger of one financial institution with another. As a substantial shareholder in Security Bancorp, he influenced the management to merge with First of America, thereby achieving a significant increase in shareholder value. Before the merger, Security Bancorp stock was trading in the range of $19.00 per share. The current effective value of those shares is $42.34 per share.

Thus in the specific circumstances of this case it appears that the harm articulated by Plaintiffs is not remote and speculative, and that the Bank's sale of the stock may indeed be irreparable.

B. Harm to Business Reputation and Good Will

■ Harm to business reputation and good will may constitute irreparable harm for the purpose of an injunction. *See, e.g., Cle–Ware, Rayco, Inc. v. Perlstein*, 401

---

**14.** Although none of the cases is directly on point, Plaintiffs and Bank One cite contradictory cases concerning the issue of speculative harm. *Compare Hanson Trust PLC v. ML SCM Acquisition, Inc.*, 781 F.2d 264 (2d Cir.1986) (court found irreparable harm to prospective tender offeror due to threatened lock-up option which would prevent takeover; court enjoined lock-up option) *with Pesch v. First City Bank of Dallas*, 637 F.Supp. 1539 (N.D.Tex.1986) (court found harm too speculative to constitute irreparable harm where plaintiff sought injunction against transfer of stock to third party Plaintiff

feared would vote against planned leveraged buyout) and *American Medicorp, Inc. v. Continental Illinois Nat'l Bank & Trust Co.*, 475 F.Supp. 5 (N.D.Ill.1977) (court found harm too speculative where plaintiff sought to enjoin defendant from loaning money to third party who intended to use loan to make tender offer that might not be approved by SEC or accepted by stockholders). As discussed in the text, the facts of this case compel the Court to find that the harm Plaintiffs allege is not too speculative to constitute irreparable harm.

F.Supp. 1231, 1234 (S.D.N.Y.1975). As set forth above, Bank One's sale of the pledged stock would harm the business reputation of the Plaintiffs by decreasing their voting power in First of America and by decreasing the confidence of other shareholders in the Luptak Beznos Group, a factor critical at a time when they are attempting to organize a shareholders' committee to influence the First of America Board of Directors.

## C. Depressed Stock Prices and Taxable Gains

 If Bank One were to sell the 176,475 shares of stock, the sale would cause stock prices to drop precipitously. The float on First of America stock for the first two weeks of August was 26,050 shares. Thus, if Bank One were to immediately sell the stock, the sale would flood the market causing a substantial drop in the stock price. Plaintiffs allege that they would be irreparably harmed by the loss of the current fair market value of the stock. Complaint, para. 84 and 85(b) & (e). Plaintiffs also allege that they will suffer taxable gains upon the sale of the stock. Complaint para. 85(c).

 Losses due to depressed stock prices and losses due to tax consequences of a sale are compensable. *Northwest Indus. Inc. v. B.F. Goodrich Co.*, 301 F.Supp. 706 (N.D.Ill.1969) (diminution of stock value is economic harm capable of redress via damage award). Monetary losses do not constitute irreparable harm. *Sampson v. Murray*, 415 U.S. 61, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974). However, as Plaintiffs have shown other irreparable harm as discussed above, it is immaterial that certain harms they would suffer would be compensable.

### *Conclusion*

In balancing the standards for preliminary injunction, the Court finds that there is a substantial likelihood that Plaintiff will succeed on the merits of their claim that the stock was pledged to secure only four loans and Bank One improperly seized the stock as security on nine loans. Further, Plaintiffs will suffer irreparable harm if they are not able to exercise their franchise rights as shareholders in First of America. Bank One will not suffer harm due to this ruling, as it still may retain the stock as security for the Stock Loans and the Lines of Credit.[15] Bank One should not be permitted to abuse a dragnet clause where the parties never intended that the pledged stock to secure a multitude of past and future loans.

The Court hereby partially grants Plaintiff's motion for preliminary injunction. Bank One is enjoined from selling, voting, or otherwise exercising any ownership rights in the pledged stock. Bank One shall enable Plaintiffs to vote the 176,475 shares of First of America stock, whether by transferring the stock back to the name of the pledgers, by providing proxies to the pledgers, or otherwise. Because the Bank still holds the stock and the Court does not require its release, the status quo has been preserved. Thus, no bond is required in this case.

At this juncture, note that this is a preliminary injunction and not a permanent one. Although Bank One may return the stock to Plaintiffs in exchange for payment on the Lines of Credit and the Stock Loans, the Court does not require Bank One to do so. The May 1990 and February 1991 Security Agreements, the Release Agreements, and all the other agreements between Plaintiffs and Bank One are still in full force and effect.

---

**15.** The standard for preliminary injunction provides that one of the factors a court should balance is whether the public interest is served by the issuance of an injunction. However, the public interest is not impacted in this case. Thus, the Court has balanced the other three factors for injunction in reaching its decision.